**In the Matter of the DISCIPLINE OF Jean Robert BABILIS, Bar No. 0159.**

No. 960167.

Supreme Court of Utah.

Dec. 12, 1997.

Brian R. Florence, Ogden, for Babilis.

Stephen R. Cochell, Kate A. Toomey, Salt Lake City, for the Utah State Bar.

STEWART, Associate Chief Justice:

The Utah State Bar, through its Office of Attorney Discipline, appeals a district court order suspending Jean Robert Babilis from the practice of law for three years. The Bar filed a complaint alleging that Babilis had accepted representation of an estate in an uncontested probate matter on the basis of a contingency fee, converted estate funds to his own use, and lied to both his clients and a court about his handling of the case. On this appeal, the Bar asserts that the trial court, instead of suspending Babilis, should have disbarred him. Babilis has cross-appealed, arguing that the trial court should have imposed a lesser penalty than a three-year suspension. He also contends that the Bar had no right to appeal the trial court's disciplinary order. We hold that the Bar has a right to appeal disciplinary orders imposed by district courts and that Babilis' misconduct warrants disbarment.

## I. FACTS

For ease of reference, we will refer to the district court that dealt with the probate proceeding as the "probate court" and the district court that dealt with the disciplinary proceeding as the "disciplinary court." The Bar filed its formal complaint with the Board of Bar Commissioners on January 6, 1993. Subsequently, this Court promulgated rules revising the procedures and rules for processing attorney discipline cases to provide, inter alia, adjudication of attorney disciplinary cases in the district courts. Thereafter, the Bar amended its complaint to comply with the requirements of the revised rules. These rules are found in chapters 14 and 15 of the Utah Court Rules. *See* R. Lawyer Discipline & Disability; Standards for Imposing Lawyer Sanctions.

The Bar's complaint was based primarily on Babilis' conduct in the probate of the estate of Jane Gayle Kerns. The decedent's stepson Thomas Kerns, to whom she had given a power of attorney prior to her death, and his wife Carol traveled from Hays, Kansas, to Utah to make funeral arrangements and to deal with Jane Kerns' estate. Upon their arrival in Utah, the Kernses experienced difficulty in gaining access to the decedent's home. Two neighbors were attempting to assert some sort of property interest in the home and had changed the locks. As a result, the Kernses sought legal counsel.

In September 1991, Thomas and Carol Kerns met with Babilis. Babilis represented to the Kernses that he was familiar with probate law, but in fact he had had little experience in the field. Babilis stated that he typically undertook probate matters on a contingency fee basis and that he believed a contingent fee of one-third of the entire estate would be less expensive than billing at an hourly rate. Babilis did not discuss with Kerns the differences between Kerns' role as a claimant on the estate and his role as personal representative of the estate, nor did Babilis inform Kerns that if Babilis acted as counsel for Kerns as the personal representative of the estate, a reasonable attorney fee would be allowed Babilis from the proceeds of the estate.

Kerns told Babilis of the estate assets of which he was aware—ownership interests in two parcels of real estate and two bank accounts totaling approximately $95,000. Kerns showed Babilis a copy of an option

agreement to purchase real estate in favor of Jane Kerns' neighbors, and he identified Mary Campbell of Cedar Rapids, Iowa, as the only other potential heir of Jane Kerns. Babilis contacted Campbell by telephone. She stated at the outset that she did not wish to receive anything from the Kerns estate. Campbell stated that Jane Kerns had told her she wished the estate to go to Thomas Kerns. Campbell subsequently assigned her interest in the estate to Thomas Kerns.[1] Neither Thomas Kerns nor Campbell knew of any other heirs.

Within two days after the first meeting with Thomas Kerns, Babilis' office had located the bulk of Jane Kerns' assets, consisting of property interests in two parcels of real estate (which were later sold for $40,000), $135,000 in four bank accounts, and approximately $40,000 in savings bonds. The day of Jane Kerns' funeral, Babilis obtained Thomas Kerns' signature on the contingency fee agreement that granted Babilis one-third of the value of the estate as his fee. Prior to obtaining the agreement, Babilis understood the nature and extent of the assets of the estate. The precise value of the bank accounts was known; the precise value of the savings bonds could have been determined easily although Babilis had not yet actually inventoried them; and the value of the real estate could have been roughly estimated. Babilis also knew that there were no likely claimants other than Thomas Kerns and that the adverse property interest asserted by Jane Kerns' neighbors was merely an option or right of first refusal that had little or no bearing on the disposition of the estate. Babilis was entitled by law to a reasonable attorney fee when acting as an attorney for the personal representative of the estate. *See* Utah Code Ann. § 75-3-718; Utah Code J. Admin. Rule 6-501.

During the latter part of 1991, Babilis wrote several checks on the estate trust account for his own personal benefit. In total, he withdrew approximately $36,000. Babilis drew one of these checks to purchase an airline ticket to Cedar Rapids, Iowa, purportedly to obtain a revised document from Mary Campbell.[2] Babilis later cashed in the ticket and applied the proceeds to the purchase of tickets for him and his wife to inspect a houseboat in Wisconsin that they planned to purchase. He then lied to the Kernses, telling them that he had gone to Cedar Rapids but had been unable to meet with Campbell because she was hospitalized at the time. Babilis did not notify Kerns or the probate court about his withdrawals and never received permission to withdraw any money from the estate trust account.

In the formal petition for settlement and distribution of the Jane Kerns estate, Babilis misrepresented to the probate court the value of the savings bonds found in the safe deposit box to conceal the fact that he had stolen a substantial portion of them. He redeemed the bonds, taking the proceeds in cashier's checks, and had one check made out to the estate in the amount of $22,575, one made out to an automobile dealer for $11,525 for the purchase of a car for personal use, and one made out to himself in the amount of $5651.43. He thus converted over $17,000 of the savings bonds to his own use and attempted to conceal this misappropriation from both the Kernses and the probate court.

Babilis also took $25,000 from the sale of Jane Kerns' real estate and attempted to take an additional $4600 as a finder's fee, even though it was Thomas Kerns who found the buyer for the property. The sale of the real estate produced $40,000 for the estate. Five months after receiving the proceeds, Babilis deposited $15,000 in the trust account but has never accounted for the remaining $25,000. He ultimately conceded that he used it for personal purposes. In total, Babilis took $78,659.43 from the Kerns estate without authorization. He claimed that this money constituted an "advance" on his "con-

---

1. Thomas Kerns was Jane Kerns' stepson and therefore not an heir. It appears that his basis for recovery from the estate was this assignment of Mary Campbell's interest.

2. Babilis' proposed Cedar Rapids trip was an unnecessary excursion. The check for the airline ticket was drawn in the amount of $1,187. The necessary affidavit was later procured by an Iowa law firm for $100.

tingent" fee.[3]

In addition, the disciplinary court found that Babilis had billed the estate for nonexistent and overcharged expenses and services. He charged $4800 for a $40 consulting fee, $700 for $100 worth of outside legal fees, $5500 for $635 of accounting work, and $622 for federal estate taxes that had been separately paid by Thomas Kerns, and charged $2500 in undocumented office expenses. He thus charged or attempted to charge the estate $14,122 for $775 worth of documented services and expenses. The Kernses were not the only victims of over-billing. Babilis' employees testified that he "routinely" billed clients at his own hourly rate for work actually done by subordinates whose rates were much lower.

In the spring of 1992, Babilis sent an accounting to the Kernses, requesting that Thomas Kerns sign it so that a final distribution of the estate could be made. Kerns discovered mathematical errors and other discrepancies, questioned the appropriateness of the contingency fee agreement, and suggested that an hourly rate was more appropriate. Babilis agreed to "eat" the expenses but falsely asserted that he had not maintained time records and therefore could not readjust their agreement to an hourly charge.

When the Kernses raised the fee issue in the probate court, Babilis repeated the same false claim about nonmaintenance of records to the court. The Kernses eventually obtained new counsel and entered into a settlement agreement in which they received $30,000 of the money Babilis had taken from the estate. Later, the existence of time records came to light. At Babilis' disciplinary trial,

his employees testified that Babilis always insisted on maintaining time records, whether a case was taken on an hourly or a contingent fee basis.

## II. THE DISCIPLINARY COURT'S RULINGS

The disciplinary court ruled that the contingency fee arrangement violated rules 1.4(b) and 1.5 of the Rules of Professional Conduct. Rule 1.4(b) requires attorneys to make explanations adequate to assist clients in making informed decisions,[4] and rule 1.5 prohibits clearly excessive fees.[5] The court held that Babilis had violated rule 1.4(b) by failing to explain the capacity in which he was acting. Babilis had essentially set himself up as the attorney for Thomas Kerns both in Kerns' capacity as a claimant and in Kerns' capacity as personal representative of the estate—a clear conflict of interest. The disciplinary court also ruled that Babilis charged a clearly excessive fee. Unable to decide the capacity in which Babilis acted, the disciplinary court addressed this issue in the alternative. If Babilis were acting as personal representative of the estate, then the contingency fee was unlawful because he was entitled by statute to a reasonable fee, *see* Utah Code Ann. § 75–3–718; Utah Code J. Admin. Rule 6–501, an amount far less than what he actually claimed.[6] If, on the other hand, Babilis acted as attorney for Thomas Kerns in his capacity as one having an inheritance interest, then according to the disciplinary court, a contingency fee was at least theoretically justifiable. Nevertheless, the disciplinary court held that the contingency fee was excessive because there was

---

**3.** Even Babilis' own calculations belie this claim. He ultimately billed the Kernses $69,920.55, significantly less than the amount he extracted from the Kerns estate.

**4.** "A lawyer shall explain a matter to the extent reasonably necessary to enable the client to make informed decisions regarding the representation." R. Prof. Conduct 1.4(b).

**5.** "A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee." R. Prof. Conduct 1.5(a).

**6.** Bruce L. Jorgensen, an experienced probate attorney, testified on behalf of the Bar and stated that a contingency fee was clearly inappropriate in an uncontested probate such as the Kerns case. He further testified that of the almost one hundred probate cases with which he had been involved, none of them had justified a fee of any more than $20,000. Jorgensen had recently worked on a highly contested, complex probate involving over a million dollars in assets and ultimately charged a fee of approximately $15,000. He testified that the Kerns' probate case should have garnered a fee of no more than $5000 to $10,000.

little or no risk that Thomas Kerns would not recover as a claimant.

The disciplinary court also found that Babilis had violated rule 1.13,[7] which requires the safekeeping of client property, because Babilis took funds from the Kerns estate account without proper authorization and used those funds for his own benefit. He violated rule 8.4(c), which prohibits dishonest dealings, fraud, deceit, or misrepresentation,[8] because he converted and misappropriated estate funds, billed for nonexistent costs, and charged paralegal time as his own. He violated rule 7.1(a), which prohibits false or misleading communications about the lawyer's services,[9] because he falsely represented the extent of his probate experience. He violated rule 3.3, which requires candor toward any tribunal, by making false material representations to the probate court as to the extent of the estate's assets and as to the existence of time records.[10]

The disciplinary court suspended Babilis from the practice of law for three years, the maximum term of suspension, and awarded the Bar costs of $4,358.89. The court refused to award restitution to the Kernses because of their prior settlement agreement with Babilis.

On this appeal, the Bar argues that the court misapplied the Standards for Imposing Lawyer Sanctions in ordering suspension rather than disbarment. The Bar asserts that the disciplinary court improperly selected suspension as the presumptively applicable penalty and, in dealing with aggravating and mitigating factors, improperly considered as mitigating factors the delay in bringing the case to trial and Babilis' personal and emotional problems. The Bar also urges this Court to adopt a "bright line" rule that disbarment is the appropriate sanction for in-

tentional misappropriation of client funds absent compelling mitigating factors. Finally, the Bar appeals the court's refusal to award restitution. On his cross-appeal, Babilis contends that under the revised disciplinary rules, the Bar has no right of appeal to this Court from the disciplinary court's ruling and that a three-year suspension was too severe.

## III. THE NEW RULES FOR ATTORNEY DISCIPLINE

The revised disciplinary rules substantially altered the framework for rendering decisions in attorney discipline cases and transferred jurisdiction over formal Bar complaints of lawyer misconduct from the Board of Bar Commissioners to the district courts. Because this is one of the first cases applying the Standards for Imposing Lawyer Sanctions, *see also In re Smith*, 925 P.2d 169, 174 (Utah 1996); *In re Cassity*, 875 P.2d 548, 550 & n. 3 (Utah 1994), a brief overview of the Standards is appropriate and helpful to our opinion and the establishment of a standard of review. The Standards for Imposing Lawyer Sanctions consist of six rules prepared by the American Bar Association, as substantially revised by the Utah Advisory Committee on the Rules of Professional Conduct. The preface to the ABA Model Standards for Imposing Lawyer Sanctions briefly states the rationale for their creation. In particular, there was a concern about consistency in the application of sanctions, not only within a particular jurisdiction, but among all jurisdictions.

> For lawyer discipline to be truly effective, sanctions must be based on clearly developed standards. Inappropriate sanctions can undermine the goals of lawyer discipline: sanctions which are too lenient fail to adequately deter misconduct and thus

---

**7.** This rule was renumbered in 1995 as rule 1.15. It reads in pertinent part, "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property."

**8.** "It is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." R. Prof. Conduct 8.4(c).

**9.** "A lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services." R. Prof. Conduct 7.1.

**10.** (a) A lawyer shall not knowingly:
   (1) Make a false statement of material fact or law to a tribunal;
   ...;
   (4) Offer evidence that the lawyer knows to be false.
R. Prof. Conduct 3.3(a).

lower public confidence in the profession; sanctions which are too onerous may impair confidence in the system and deter lawyers from reporting ethical violations on the part of other lawyers. Inconsistent sanctions, either within a jurisdiction or among jurisdictions, cast doubt on the efficiency and the basic fairness of all disciplinary systems.

Preface to ABA Model Standards for Imposing Lawyer Sanctions (1992).

The Model ABA Standards were developed by studying reported lawyer discipline cases.[11] *Id.* The ABA Sanctions Committee concluded that although the courts of various jurisdictions were consistent in identifying relevant policy concerns—e.g., protecting the public, ensuring the administration of justice—they generally "failed to articulate any theoretical framework for use in imposing sanctions." *Id.* The Model Standards are an attempt to establish such a framework. "The Sanctions Committee unanimously rejected ... as being both theoretically simplistic and administratively cumbersome" any attempt at "identifying each and every type of misconduct in which a lawyer could engage, then suggesting either a recommended sanction or a recommended range of sanctions." *Id.* The Committee opted instead for a theoretical framework that "looks first at the ethical duty and to whom it is owed, and then at the lawyer's mental state and the amount of injury caused by the lawyer's misconduct." *Id.* Still, the ABA Standards remain significantly more detailed than the Utah Standards that were derived from them. The ABA Standards set forth recommended levels of generally appropriate sanctions for a multitude of differing types of violations, *see generally* ABA Standards for Imposing Lawyer Sanctions (1992), whereas the Utah Standards have opted for even more general and streamlined guidelines.

The essential purposes of Utah's Standards are nonetheless the same as those pursued by the Model Standards. Rule 1 of the Utah Standards discusses the nature and purpose of sanctions. Specifically, rule 1.1 of the Standards states:

> The purpose of imposing lawyer sanctions is to ensure and maintain the high standard of professional conduct required of those who undertake the discharge of professional responsibilities as lawyers, and to protect the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or likely to be unable to discharge properly their professional responsibilities.

The ABA Sanctions Committee observed:

> While courts express their views on the purpose of lawyer sanctions somewhat differently, an examination of reported cases reveals surprising accord as to the basic purpose of discipline. As identified by the courts, the primary purpose is to protect the public. Second, the courts cite the need to protect the integrity of the legal system, and to insure the administration of justice. Another purpose is to deter further unethical conduct and, where appropriate, to rehabilitate the lawyer. A final purpose of imposing sanctions is to educate other lawyers and the public, thereby detering [sic] unethical behavior among all members of the profession.

ABA Model Standards for Imposing Lawyer Sanctions, Commentary to Rule 1.1 (footnotes omitted).

Rule 2 outlines the various sanctions that are available, including disbarment, suspension, interim suspension, reprimand, admonition, probation, resignation with discipline pending, and other sanctions and remedies. Rule 3 relates the factors the disciplining court should consider in imposing sanctions: "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d)

11. Specifically, the ABA Sanctions Committee examined

all reported lawyer discipline cases from 1980 to June, 1984, where public discipline was imposed. In addition, eight jurisdictions, which represent a variety of disciplinary systems as well as diversity in geography and population size, were examined in depth. In these jurisdictions—Arizona, California, the District of Columbia, Florida, Illinois, New Jersey, North Dakota, and *Utah*—all published disciplinary cases from January, 1974 through June, 1984, were analyzed.

(Emphasis added; footnote omitted.)

the existence of aggravating or mitigating factors."

Rules 4, 5, and 6 are particularly important in furthering the consistency of result sought by the revised Standards. They are the most concrete embodiment of the theoretical framework proposed by the ABA Sanctions Committee, as revised and adopted in Utah's present disciplinary rules. Rule 4 provides guidelines for assigning the major levels of sanction: disbarment, suspension, reprimand, and admonition. Rule 5 governs treatment of prior orders of discipline with respect to a lawyer's violation of the terms of disciplinary order and also treats the impact of prior orders on subsequent cases involving separate instances of misconduct. This rule treats prior violations as an aggravating factor to be considered in imposing the ultimate disciplinary order. Rule 6 lays out the guidelines for assessing all other aggravating and mitigating factors.

## IV. STANDARD OF REVIEW

The change in the initial formal adjudication of Bar complaints did not alter the unique constitutional role that this Court has in attorney discipline cases. Article VIII, section 4 of the Utah Constitution states, "The Supreme Court by rule shall govern the practice of law, including admission to practice law and the conduct and discipline of persons admitted to practice law." *See also In re McCune*, 717 P.2d 701, 704–05 (Utah 1986) (reaffirming this Court's constitutional authority and responsibility for attorney discipline).

■ Under the revised disciplinary rules, a district court finds the facts and enters an order of discipline that is a final order unless appealed. When an order is appealed, the scope of review that this Court will exercise remains the same as before. Thus, we will ordinarily presume findings of fact to be correct and will not overturn them "unless they are arbitrary, capricious, or plainly in error." *In re Knowlton*, 800 P.2d 806, 808 (Utah 1990). Nevertheless, in light of our constitutional mandate and "the unique nature of disciplinary actions and our knowledge of the nature of the practice of law," we accord less deference to the findings

of a lower tribunal. *Id.* "[W]e ... reserve the right to draw inferences from basic facts which may differ from the inferences drawn by the [lower tribunal]." *Id.* Although we recognize as a general proposition the district court's advantaged position in overall familiarity with the evidence and the context of the case, on appeal we must treat the ultimate determination of discipline as our responsibility. *See id.* "In this regard, it is imperative to bear in mind that the review of attorney discipline proceedings is fundamentally different from judicial review of administrative proceedings," *id.*, or of other district court cases.

In sum, this Court will ordinarily presume that the [lower tribunal's] findings of fact are correct, although we may set those findings aside if they are not supported by the evidence. If the evidence warrants, we may make an independent judgment regarding the appropriate level of discipline, although we always give serious consideration to the findings and [rulings] of the [district court].

*Id.* at 809.

## V. THE BAR'S RIGHT TO APPEAL

■ Babilis argues that the current Rules of Lawyer Discipline give a right to appeal only to an attorney subject to discipline and that this Court has no jurisdiction to hear an appeal by the Bar. The prior version of the disciplinary rules explicitly permitted both the "attorney [and] Bar counsel" to file a formal appeal from the recommendations of the Board to this Court. *See* Procedures of Discipline of the Utah State Bar Rule XIV(a) (1992). Under the revised disciplinary rules, formal complaints are adjudicated by district courts and "[e]xcept as otherwise provided in these rules, the Utah Rules of Civil Procedure, the Utah Rules of Appellate Procedure governing civil appeals, and the Utah Rules of Evidence, apply in formal discipline actions and disability actions." R. Lawyer Discipline & Disability 17(a). Under the Rules of Appellate Procedure, any litigant who otherwise has standing to do so may appeal an adverse judgment. *See* Utah R.App. P. 3–5.

Rule 11(g) of the revised disciplinary rules states, "Any order of public discipline may be appealed to the Supreme Court pursuant to the Utah Rules of Appellate Procedure." Under that rule, there is no different standard for standing to appeal than applies in any other civil case. Both the Bar and an attorney subject to discipline may appeal an order of discipline to this Court.[12]

The Bar continues to perform an essential, although somewhat more limited, role in the enforcement of rules of attorney discipline under the revised rules, but those rules do not alter this Court's constitutional role in attorney discipline matters. Under Babilis' argument, this Court would be precluded from reviewing a number of disciplinary cases, thereby obstructing this Court in the exercise of its constitutional powers and duties.

■ Babilis argues that this case is analogous to a criminal case and that double jeopardy prevents prosecutors from appealing final orders. The revised disciplinary rules state that disciplinary adjudications are civil proceedings, *see* Rule 1(c), and we see no basis for concluding otherwise. The penalties available under the Standards for Imposing Lawyer Sanctions are not punishment for double jeopardy purposes. *In re McCune*, 717 P.2d 701, 707 (Utah 1986); *In re Brown*, 12 Cal.4th 205, 48 Cal.Rptr.2d 29, 906 P.2d 1184, 1191 (1995); *see also Helvering v. Mitchell*, 303 U.S. 391, 399 n. 2, 58 S.Ct. 630, 633 n. 2, 82 L.Ed. 917 (1938); *State v. Arbon*, 909 P.2d 1270, 1274 (Utah.Ct.App.1996). An attorney's license to practice law is contingent on compliance with professional ethical standards. A restriction on, or withdrawal of, the right to practice law as a sanction for

violation of professional ethical standards is remedial in nature. "Bar disciplinary proceedings are civil in nature. Their aim is to maintain the honesty, integrity and professionalism of the Bar." *McCune*, 717 P.2d at 707; *see also Brown*, 48 Cal.Rptr.2d 29, 906 P.2d at 1191. Attorney discipline therefore is neither punitive nor a criminal penalty in any sense.

## VI. SUSPENSION AND DISBARMENT

■ The Bar argues that the disciplinary court misread and misapplied the Standards for Imposing Lawyer Sanctions in imposing a three-year suspension rather than disbarment on Babilis. We agree.

The Standards that are relevant in deciding whether suspension or disbarment is the appropriate remedy are stated in rules 4.2, 4.3, and 6. In pertinent part, these rules read as follows:

*Rule 4.2 Disbarment.*

Disbarment is generally appropriate when a lawyer:

(a) knowingly engages in professional misconduct as defined in Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct[13] *with the intent to benefit the lawyer or another or to deceive the court,* and causes serious or potentially serious injury to a party, the public, or the legal system, or causes serious or potentially serious interference with a legal proceeding; or

(b) engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution, or im-

---

**12.** Babilis argues that the new rules preclude an appeal in cases where formal complaints are summarily dismissed because the new rules do not specifically address appeal rights in that situation. Thus, Babilis asserts, because the Bar has no right to appeal a summary dismissal, it has no right to appeal orders of public discipline. Even if we were to accept the assertion that the Bar has no right to appeal summary dismissals, there is no textual or policy justification for assuming that a district court's final order on discipline is immune from appeal by the Bar.

**13.** The referenced portion of rule 8.4 states:

It is professional misconduct for a lawyer to:

(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

. . .;

(d) Engage in conduct that is prejudicial to the administration of justice;

(e) State or imply an ability to influence improperly a government agency or official;

(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law. . . .

portation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(c) engages in any other intentional misconduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law.

(Emphasis added.)

*Rule 4.3 Suspension.*

Suspension is generally appropriate when a lawyer:

(a) knowingly engages in professional misconduct as defined in Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct[14] and causes injury or potential injury to a party, the public, or the legal system, or causes interference or potential interference with a legal proceeding; or

(b) engages in criminal conduct that does not contain the elements listed in Standard 4.2(b) but nevertheless seriously adversely reflects on a lawyer's fitness to practice law.

*Rule 6.1. [Aggravation and Mitigation] Generally.*

After misconduct has been established, aggravating and mitigating circumstances may be considered and weighed in deciding what sanction to impose.[15]

Rules 4.2 and 4.3 set out standards that establish disbarment or suspension as the presumptive levels of discipline. Rule 6 provides for the adjustment of the presumptive discipline according to mitigating and aggravating factors. Suspension may be imposed for a period of anywhere between six months and three years, but the actual period of suspension should be subject to a degree of flexibility in fixing the exact sanction, giving effect to *mitigating and aggravating* circumstances.[16] The presumptive discipline may be increased from suspension, for example,

to disbarment in the case of overwhelming aggravating factors, or decreased from suspension to a reprimand in the case of unusual or substantial mitigating factors. Usually, adjustments under rule 6 will simply involve more precise tailoring of the presumptive sanction according to the principle stated in rule 1.3: "The standards constitute a system for determining sanctions, permitting flexibility and creativity in assigning sanctions in particular cases of lawyer misconduct."

In addition, under rule 2.9, a court may impose in conjunction with any order of discipline "(a) [a requirement for payment of] restitution; (b) assessment of costs; (c) limitation upon practice; (d) appointment of a receiver; (e) a requirement that the lawyer take the bar examination or professional responsibility examination; [or] (f) a requirement that the lawyer attend continuing education courses."[17]

The disciplinary court found that suspension was the proper presumptive level of discipline under rule 4. The court stated that rule 4.2, relating to disbarment, "provides three categories of misconduct qualifying for disbarment. Though Mr. Babilis' misconduct could be described as included under subparts (a) and (c), it does not fit well under subpart (b)." The court thus held that rule 4.3(a) and (b), which pertains to suspension, "most accurately described the misconduct of Mr. Babilis."

■ The court erred in reading rule 4.2. Subparagraphs (a), (b), and (c) of that rule *do not* require that all three subdivisions be violated for disbarment to be the presumptive discipline. Subparagraphs (a), (b), and (c) are set off with the disjunctive "or." A finding under any one of the three is sufficient to establish disbarment as the presumptive sanction.

Paragraphs (a) of rules 4.2 and 4.3 use identical language, except that 4.2(a), unlike 4.3(a), requires that the violation of the Rules

---

**14.** *See supra* note 13.

**15.** The balance of rule 6 lists specific examples of aggravating factors, mitigating factors, and factors that should be considered neither aggravating nor mitigating.

**16.** Rule 2.3 allows but nevertheless discourages suspension for less than six months.

**17.** Presumably, in light of rule 1.3's directive encouraging courts to be creative and flexible, this list is not exhaustive.

of Professional Conduct be done "with the intent to benefit the lawyer or another or to deceive the court." Thus, the difference between the sanctions of disbarment and suspension under paragraphs (a) of rules 4.2 and 4.3 lies in the attorney's motive and in the relative severity of the conduct.

The disciplinary court found that Babilis took money from the Kerns estate trust account, intentionally failed to account for assets of the estate, and intentionally overbilled the Kernses for costs and expenses and that he did all this with the intent to benefit himself or to deceive the court. The record amply supports the disciplinary court's factual findings. Babilis induced the Kernses to enter into an exorbitant and wholly improper contingency fee agreement. Babilis arranged for fees to be paid him both as counsel for Thomas Kerns as representative of the estate and as counsel for Thomas Kerns as claimant, thereby violating the proscription on excessive and improper fees. As counsel for the personal representative of the estate, Babilis had a statutory right to recover a reasonable fee,[18] see Utah Code Ann. § 75-3-718; Utah Code J. Admin. Rule 6-501, but he demanded one-third of the estate under a "contingent" fee agreement. He also concealed property belonging to the estate, which he converted or attempted to convert to his own use. He attempted to charge the estate nonexistent or over-billed costs. He submitted documents, including sworn affidavits, to the probate court reflecting a false accounting of the estate's assets. He lied to the Kernses on more than one occasion in an attempt to conceal his misconduct and admitted to having made "errors" or "mistakes" only when squarely confronted with specific instances of misconduct, and he lied to both the probate court and the disci-

plinary court with respect to particular aspects of his misconduct.

In short, the record is replete with examples of deceit, dishonesty, and misrepresentation, all motivated by Babilis' desire to enrich himself. Accordingly, disbarment was presumptively the appropriate sanction under rule 4.2(a).

In applying rule 6, the disciplinary court found multiple aggravating factors and few mitigating factors. The court found that Babilis' conduct was self-serving and part of an established pattern of misconduct that encompassed not only the Kerns case but also his dealings with other clients, so that this was one of multiple instances of misconduct. In addition, the court found that Babilis had not satisfactorily acknowledged the wrongful nature of his actions and that the Kernses were vulnerable victims of his misconduct. The court also examined other potential aggravating factors, such as a prior record of discipline and submission of false evidence.

As potential mitigating factors, Babilis produced favorable testimony from some of his other clients and evidence of personal and emotional problems that he was suffering at the time. The court did not find these factors to be substantial mitigating or aggravating considerations.[19] The only factor that the court explicitly treated as mitigating was the four-year delay in the disciplinary process.

The Bar objected to the court's finding on this issue because the delay was occasioned by a number of factors, including the transition to the new disciplinary procedural rules that necessitated refiling the complaint in district court and collateral bankruptcy and tax evasion proceedings in which Babilis was embroiled. The court found that the "delay was not occasioned specifically by [the] fault

---

18. Babilis asserts that he acted solely as counsel for Thomas Kerns as a claimant. That contention does not square with Babilis' actions. Babilis submitted documents to the probate court that could have been submitted only by the representative of the estate and generally acted as the attorney managing the overall settlement of the estate.

19. The Bar argues that the court improperly treated Babilis' personal and emotional problems

as a mitigating factor. A fairer reading of the court's findings, however, is that the court considered Babilis' asserted problems but was unwilling to treat them as mitigating. The court noted, "Mr. Babilis had his plate full of adversities ... [but] most of those problems were of Mr. Babilis' own making and though they may aid, in some degree, in explaining his behavior, they do not excuse it."

of either party" but nevertheless concluded that Babilis had been "prejudiced to some degree by the delay in both ability to recollect and the effect adverse publicity has had on him personally and on his practice."

In any event, the delay was not prejudicial. There are no facts indicating that Babilis opposed the delay or even complained about it. Indeed, at least some of the delay was apparently for his benefit so that he could resolve other pressing concerns. The disciplinary court concluded that the cloud of disrepute engendered by bad publicity on "[r]espondent and his practice [was] not insubstantial." Nevertheless, Babilis was the person responsible for this, and it is difficult to comprehend how the delay harmed his reputation; rather, it enabled him to push back the day of judgment.

In sum, the aggravating factors were substantial and numerous, and the mitigating factors were minor and did not justify lessening the presumptive disclosure of disbarment. In our view, disbarment was the appropriate sanction.

■ The Bar additionally requests that we adopt as a general rule the principle that "intentional misappropriation of client funds will result in disbarment unless the lawyer can demonstrate truly compelling mitigating circumstances." The Bar asserts that such a rule is necessary to protect the public, to place all lawyers on notice of the consequences of intentional misappropriation, and to ensure consistency of result in attorney discipline cases. We agree.

Intentional misappropriation of a client's funds is always indefensible; it strikes at the very foundation of the trust and honesty that are indispensable to the functioning of the attorney-client relationship and, indeed, to the functioning of the legal profession itself. *See In re Davis,* 754 P.2d 63, 66 (Utah 1988); *In re Wilson,* 81 N.J. 451, 409 A.2d 1153, 1154–55 (1979); *Carter v. Ross,* 461 A.2d 675, 676 (R.I.1983); *cf. In re Smith,* 925 P.2d 169, 174 (Utah 1996). The honesty and loyalty that all lawyers owe their clients are irrevocably shattered by an intentional act of misappropriation, and the corrosive effect of such acts tends to undermine the foundations of the profession and the public confidence that is essential to the functioning of our legal system. Lawyers should be on notice that an intentional act of misappropriation of a client's funds is an act that merits disbarment.

## VII. RESTITUTION

■ The disciplinary court refused to award restitution, apparently because it decided that the issue had been litigated and resolved by a settlement between the Kernses and Babilis. However, that constitutes neither res judicata nor collateral estoppel as to the sanctions requested by the Bar. The parties to this dispute are the Bar and Babilis. Although restitution relates to the dealings between Babilis and the Kernses and is payable to the Kernses, the Bar is not merely vindicating the Kernses' personal interests when it demands restitution of ill-gotten property. The Bar is promoting the purposes of the Rules of Lawyer Discipline and the Standards for Imposing Lawyer Sanctions, which are "to ensure and maintain the high standard of professional conduct required of those who undertake the discharge of professional responsibilities as lawyers, and to protect the public and the administration of justice." R. Lawyer Discipline & Disability 1; Standards for Imposing Lawyer Sanctions Rule 1.1. Because enforcement of attorney discipline matters implicates public interests that transcend the personal interests of the Kernses, the Bar is not acting on behalf of the Kernses but is acting to enforce sanctions in its own right. Therefore, any prior agreement between Babilis and the Kernses cannot bind the Bar or prevent it from demanding appropriate sanctions. *See Searle Bros. v. Searle,* 588 P.2d 689, 691 (Utah 1978) (res judicata and collateral estoppel apply only to same parties or their privies). The settlement between the Kernses and Babilis is relevant only to the issue of the amount of restitution still owing.

Because no factual findings have been made on the issue of restitution, we remand for the purpose of making those findings and awarding an appropriate restitution designed

**218**

to fully compensate the Kernses for the depredations visited upon them.

DURHAM and RUSSON, JJ., concur in Associate Chief Justice STEWART's opinion.

ZIMMERMAN, Chief Justice, concurring:

I concur in the court's opinion. However, I write to note the importance this court is placing on the terms of the Standards for Imposing Lawyer Sanctions and on trial courts adhering to those standards, both in classifying conduct for purposes of determining the presumptive sanction and in assuring that mitigating and aggravating circumstances are weighed appropriately before any decision is made to depart from the presumptive sanction.

There is good reason for requiring adherence to these standards. One of the failings of the disciplinary regime as it existed before the present one was that when sanction recommendations came to this court from the Bar Commission, there was no set of standards that defined the sanction generally appropriate for any given type of conduct. That meant that the Bar's recommendations had something of an ad hoc character to them, when viewed over the years, and that this court's action on those recommendations had a similar character. In the absence of a detailed set of guidelines, both the Commission and this court were left a bit at sea, which raised the possibility that those similarly situated might not receive similar sanctions. This lack of guidelines was noted by the court and was one of the factors that prompted the adoption of the current standards.

Now that we have standards, we should be vigorous in requiring that trial courts follow them so that all concerned know that each judge across the state before whom disciplinary matters are brought is following the same script. This will lessen concerns on the part of lawyers that the sanction imposed in a given case will depend more on the judge before whom the matter is tried than on the nature of the conduct; it will increase the confidence of trial judges that if they follow the standards, they will not be overturned unexpectedly; and it will lessen the inclination of lawyers to appeal sanctions in the hope that this court will idiosyncratically lessen a sanction that is in accordance with the standards' detailed requirements. These standards are a significant advance in the effort to treat similarly situated persons similarly, something that is essential if the lawyer discipline machinery we have crafted is to retain the confidence of the Bar and the public.

HOWE, J., concurs in Chief Justice ZIMMERMAN's opinion.