**In the Matter of the Complaint Against Donn E. CASSITY, DOB: 5–31–26 ADM: 1–11–54.**

**No. 930372.**

Supreme Court of Utah.

May 18, 1994.

Jo Carol Nesset–Sale, Salt Lake City, for Cassity.

Wendell K. Smith, Salt Lake City, for the Bar.

HOWE, Justice:

The Office of Bar Counsel filed a formal complaint against Donn E. Cassity alleging that he had violated rules 1.1 (competence), 1.5(a) (illegal or clearly excessive fees), and 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. At the disciplinary hearing, bar counsel dismissed the allegations regarding Cassity's competence and fees. The hearing panel found that Cassity had violated rule 8.4(c). It recommended a public reprimand, six months' probation, and payment of restitution and costs.

The Board of Bar Commissioners affirmed the panel's findings, conclusions, and recommendation of discipline. However, approximately one week later, bar counsel filed a petition for reconsideration under rule XII(f) of the Procedures of Discipline of the Utah State Bar.[1] The board granted the petition and, after hearing oral argument, modified its recommendation, concluding that Cassity should be suspended from the practice of law for one year. Cassity requested that the board make new findings and conclusions "regarding the standards, the burdens of proof, and the procedures used in its reconsideration and how those standards, burdens and procedures differed" from those used when the board first affirmed the panel's findings, conclusions, and recommendation. The board refused the request, and Cassity appeals.

The formal complaint arose out of Cassity's representation of Ed and Kathy Mantha, who retained him on an hourly fee to defend a lawsuit brought against them and to prosecute a counterclaim. Both the lawsuit and the counterclaim were related to the sale of the Manthas' California hardware store. They had sold the store to Mr. and Mrs. Spence for $860,000, taking two promissory

---

1. Effective July 1, 1993, this court repealed the Procedures of Discipline of the Utah State Bar and adopted the Rules of Lawyer Discipline and Disability. Bar counsel filed this case when the prior procedures were in effect.

notes for part of the debt, one for $100,000 and the other for $240,000. Sometime later, the Spences filed for bankruptcy. The trustee brought an adversary action against the Manthas, alleging fraud in the valuation of the store and its inventory. The trustee sought "a few $100,000" in actual damages and $500,000 in punitive damages. The Manthas, who then resided in Canada, retained Cassity, a Utah practitioner, to defend them in the California bankruptcy court and to prosecute their counterclaim for enforcement of the two promissory notes.

On September 7, 1987, the day scheduled for trial, Cassity and Wayne Freestone, an attorney associated with his firm, accompanied the Manthas to the courthouse in San Jose, California. At that time, the Manthas believed the value of their counterclaim had been reduced to $100,000 because the court had ruled that the note for $240,000 was unenforceable.[2] Shortly after the group arrived at the courthouse, the Spences' counsel offered to settle the case by paying the Manthas $15,000. Mr. Mantha, who was opposed to settlement, extended a counteroffer of $100,000. Over the next three or four hours, the distance between the Spences' offers and the Manthas' counteroffers narrowed. When an offer of $44,000 was on the table, Mr. Mantha refused to negotiate further and left the room. Mrs. Mantha testified that before leaving, he "gave her authority to settle" but told her their marriage was "over" if she did. Mrs. Mantha continued to negotiate and finally accepted $62,500 in full settlement of the counterclaim.

At some point during the negotiations, Cassity offered to take one-half of the settlement proceeds in full payment of approximately $144,000 in accrued legal fees. The testimony before the hearing panel as to when he made this offer is contradictory. Mrs. Mantha testified that he did it when the $15,000 settlement offer was on the table and that she relied on it throughout the negotiations. Mr. Freestone had "an impression" that Cassity made the proposal after the final settlement offer was made but before Mrs. Mantha accepted it. He also testified that

Cassity's offer was "the thing that convinced Mrs. Mantha to accept the settlement offer." Cassity, on the other hand, testified that he did not agree to accept one-half of the proceeds in full settlement of his accrued fees until after Mrs. Mantha had accepted the final offer of $62,500. The disciplinary panel resolved this factual dispute against Cassity. It found that "prior to the time the final offer of settlement was made [he] . . . agreed to split evenly the proceeds of the settlement with the [Manthas] and to forgive the outstanding balance due for attorneys fees that exceeded the amount he would receive from his share of the settlement proceeds." It also found that Mrs. Mantha accepted the $62,500 settlement "in reliance upon [this] representation and agreement."

While the Manthas and Cassity were negotiating, representatives of the National Labor Relations Board (the "NLRB") waited in the bankruptcy court to attach any settlement proceeds paid to the Manthas. The NLRB had a judgment lien against them for approximately $18,000. To avoid the NLRB lien, Mrs. Mantha suggested that Cassity tell the bankruptcy court that the entire $62,500 settlement would be paid to his law firm as attorney fees. He did so, despite his prior agreement to give $31,250 to the Manthas and to forgive the balance of his fees. The court paid approximately $44,000 to Cassity's firm in November 1987; however, it withheld payment of $18,000 until the NLRB's claim was resolved. Over the next several months, the Manthas incurred additional legal fees because Cassity represented them in the proceedings against the NLRB. Cassity was unable to secure the release of the $18,000 until the spring of 1988. Despite his continuing promises to pay, Cassity failed to remit to the Manthas any of the settlement proceeds.

Recommendations for discipline are " 'advisory' in the sense that they are not and cannot be binding on this court." *In re Calder,* 795 P.2d 656, 657 (Utah 1990). "We need not, therefore, defer to the Board in deciding what may constitute appropriate discipline." *In re Knowlton,* 800 P.2d 806,

---

2. Cassity testified that he did not remember such a ruling. He speculated that Mrs. Mantha may

have misunderstood the legal effect of the notes' being declared "unsecured."

808 (Utah 1990). Unreasonable recommendations for discipline will be rejected. *Calder*, 795 P.2d at 657.

As explained earlier, the hearing panel concluded that Cassity had violated rule 8.4(c) in that he engaged in conduct involving "dishonesty, fraud, deceit or misrepresentation." In determining the appropriate sanction, the panel considered as aggravating factors Cassity's "substantial experience in the practice of law" and his "refusal to acknowledge the wrongful nature of his conduct." In mitigation, it considered "the absence of a prior disciplinary record" and Cassity's "cooperative attitude" in the proceedings. The panel specifically noted that he had voluntarily surrendered "incriminating documents" to the Bar pursuant to a discovery request. Balancing these factors, the panel recommended that Cassity pay the Manthas $20,000 in restitution and that he be "publicly reprimanded and placed on probation for six (6) months." Originally, the board adopted this recommendation as its own. However, pursuant to bar counsel's petition for reconsideration, the board modified that recommendation, finding that a one-year suspension was a more appropriate sanction.

■ In determining the appropriate discipline, we look to the Standards for Imposing Lawyer Sanctions. ABA Standards for Imposing Lawyer Sanctions (1992) (adopted by ABA House of Delegates 1986) (the "ABA Standards"); *see* Utah Code of Jud.Admin. ch. 15, Standards For Imposing Lawyer Sanctions (effective July 1, 1993) (the "Utah Standards").[3] Before the hearing panel, before the board, and on appeal to this court, bar counsel has consistently argued for disbarment. He contends that disbarment is required because Cassity "knowingly convert[ed] client property and cause[d] injury or potential injury to a client." ABA Standards § 4.11 (disbarment appropriate when lawyer "knowingly converts client property

and causes injury or potential injury to a client"); *see* Utah Standards Rule 4.2(b) (disbarment appropriate when lawyer "engages in serious criminal conduct, a necessary element of which includes . . . misappropriation, or theft").

The record shows that the hearing panel treated this case as a fee dispute, not as a conversion. It found that Cassity "agreed to split evenly the proceeds of the settlement with [the Manthas] and to forgive the outstanding balance due for *attorney's fees* that exceeded the amount he would receive from his share of the settlement proceeds." (Emphasis added.) There is some dispute as to whether Cassity also forgave the $14,900 in costs that the Manthas owed him. Also, the Manthas incurred additional legal fees after the settlement date which they did not pay. Cassity testified that he did not forgive these additional fees and that the Manthas knew it.

Finally, the panel's restitution order indicates that it treated the case as a fee dispute. It ordered Cassity to pay the Manthas only $20,000 in restitution rather than $31,250 (one-half of the settlement proceeds). The panel arrived at this figure by allowing $11,250 for the additional fees the Manthas incurred after the settlement was reached. The board adopted this recommendation of restitution and did not modify it on reconsideration.

■ The ABA Standards provide for disbarment when a lawyer "engages in . . . intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that *seriously adversely reflects* on the lawyer's fitness to practice law." ABA Standards § 5.11(b) (emphasis added); *see* Utah Standards Rule 4.2(c). However, reprimand is the appropriate sanction when a lawyer "engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that *adversely reflects* on the lawyer's fitness to practice law." ABA Standards § 5.13; *see*

3. In May 1993, this court adopted the Standards for Imposing Lawyer Sanctions, which became effective July 1, 1993. Utah Supreme Court Minute Entry No. 920334. The Utah Standards were based on the ABA Standards but were "substantially revised by the Advisory Committee." Utah Standards, Summary. Because this case arose before July 1, 1993, the parties relied on the ABA Standards. Nevertheless, we look to both the ABA Standards and the Utah Standards for guidance. *See generally In re Complaint Against Smith*, 872 P.2d 447, 450 n. 2 (Utah 1994) (relying on Utah Standards even though case arose before July 1, 1993).

Utah Standards Rule 4.4(b). Cassity failed to remit to the Manthas their rightful portion of the settlement proceeds; however, this conduct occurred in the context of a fee dispute. The gravamen of his misconduct was his continuing representations that he would pay the Manthas and his subsequent failure to do so. In light of the aggravating and mitigating factors, we conclude that his conduct adversely reflects on his fitness to practice law. Thus, while we agree with the board that Cassity's conduct violates rule 8.4(c), we conclude that the more appropriate discipline is a public reprimand and six months' probation.

█ The panel did find that "[i]n order to avoid attachment of the settlement proceeds by the NLRB, [Cassity] agreed with [the Manthas] that he would falsely represent to the court and the NLRB that all of the proceeds of the settlement were to be paid to his law firm for attorney fees." We recognize the seriousness of this misconduct; however, after reading the record, we conclude that it was not at issue before the disciplinary panel. The formal complaint did not charge a violation of Rule of Professional Conduct 3.3, which expressly prohibits a lawyer from "knowingly mak[ing] a false statement of material fact or law to a tribunal." Likewise, neither bar counsel nor Cassity mentioned the false statement in opening or closing argument before the panel. At the time of the disciplinary hearing, bar counsel's only interest in the misrepresentation to the bankruptcy court was to show that it was false—that the entire settlement was *not* going to Cassity's firm as attorney fees but was in fact to be split fifty-fifty with the Manthas.

In support of his petition for reconsideration by the board, bar counsel presented Cassity's false statement to the bankruptcy court as an independent act of misconduct warranting disbarment. While the record is incomplete on this point, this new emphasis may have been the reason the board abandoned its original recommendation in favor of a one-year suspension. It is unfair to discipline Cassity for conduct that was not charged in the formal complaint. Moreover, this case arose out of the Manthas' complaint that Cassity had failed to remit to them one-half of the settlement proceeds. They did not complain about his false statement to the bankruptcy court. In fact, they were the beneficiaries of it. Mrs. Mantha suggested the idea to Cassity to protect their half of the settlement proceeds from the NLRB. Had the false statement to the court been charged and prosecuted before the hearing panel as an independent act of professional misconduct, disbarment or suspension may have been appropriate, but that was not the case. *See* Utah Standards Rule 4.2(a).

Admittedly, Cassity's false statement to the bankruptcy court is conduct which involves "dishonesty, fraud, deceit, or misrepresentation." Utah Rules of Professional Conduct 8.4(c). However, in specifying which of Cassity's acts violated rule 8.4(c), the panel did not refer to his false statement to the court but to his repeated misrepresentations to the Manthas that he intended to pay them. When Ms. Nesset–Sale, Cassity's counsel, asked the panel chairman, Mr. Stansfield, to "state exactly" the panel's findings concerning the violation of rule 8.4(c), the following exchange occurred:

MS. NESSET–SALE: Just in asking for clarity in terms of the chair has generally stated a violation. Is the finding that there has been a violation of 8.4(c) in that my—I think we need to state exactly what the finding is. That he acted with deceit, misrepresentation or fraud in that he, prior to the conclusion of the settlement negotiation, made an offer to remit the 31,250 and that was relied upon and which was a basis for the Manthas agreeing to settle at 62,500. Is that essentially—

MR. STANSFIELD: Well, it's not quite that limited. We believe that it was prior. We also believe that he made the statements and representations for a consistent and repeated period down the road after that also . . . .

. . . .

MS. NESSET–SALE: . . . But here the essence was that they relied upon the misrepresentation, but for the representation they would not have accepted the settlement. So the facts of this case this would not be reliance and harm, but for their

have accepting the deal. I mean I'm assuming that's what you have found.

MR. STANSFIELD: We have found that representation and the agreement was made before the settlement was made.

MS. NESSET–SALE: Right.

MR. STANSFIELD: We also think that after the settlement was made, there was a continuous series of action that had a bearing on the violation also.

MS. NESSET–SALE: That reaffirmed—

MR. STANSFIELD: Continual representations by [Cassity] about what he was going to do when, in fact, he was not going to do that.

In short, Cassity's false statement to the court did not contribute to the panel's determination that he violated rule 8.4(c).

Finally, Cassity argues that rule XII(f) of the Procedures of Discipline of the Utah State Bar violates the state due process clause. Utah Const. art. I, § 7. He contends that the rule permits the board to act arbitrarily and capriciously because it does not specify the grounds on which it may "amend, modify or reconsider the findings, conclusions and recommendation" of a disciplinary panel. Rule XII(f). Because we reject the board's modified recommendation of discipline in favor of its original recommendation, we need not address this question.

We affirm the board's recommendations for restitution. However, we reject its recommendation of a one-year suspension. The appropriate discipline is a public reprimand and six months' probation.

STEWART, Associate C.J., and DURHAM and RUSSON, JJ., concur.

ZIMMERMAN, Chief Justice, concurring in the result:

I reluctantly concur in the result reached by the majority. I do so only because the prosecution below focused on Cassity's failure to deal properly with his clients regarding the fee. Had the prosecution focused more directly on what I view to be the more serious misconduct by Cassity—his deliberate misrepresentation to the California bankruptcy court that the full settlement amount was to go to Cassity as a fee, a representation made with the sole purpose of defrauding the NLRB out of its lien—I would heartily endorse more serious discipline. And lest there be any question about the facts of the matter, the hearing panel did find that such an explicit misrepresentation was made for just such a purpose.

Conduct such as Cassity's factual misrepresentation to the court strikes at the heart of the legitimacy of the adversary system. The importance of a lawyer's obligation of candor to the tribunal cannot be overstated. Lawyers have an ethical obligation to be advocates for their clients, not to be their co-conspirators. See generally Michael D. Zimmerman, *Professional Standards Versus Personal Ethics: The Lawyer's Dilemma,* 1989 Utah L.Rev. 1. It would ignore reality not to recognize that at times, cultural and economic pressures cause some lawyers to forget the distinction. *Id.* But when such conduct comes to light, I think it should be punished harshly to serve as continuing notice on errant members of the profession that we will not tolerate it. Severe punishment also assures the public that, despite the cynical teachings of popular culture that lawyers are prostitutes in nice clothing fit only for dinosaur food, in fact, lawyers are bound by rigid ethical standards which are designed to preserve the integrity of the adversary system.

Mr. Cassity escapes a punishment of appropriate severity, by reason of Bar Counsel's failure to make his misrepresentation to the bankruptcy court a focus of the proceeding below and by the majority's resulting compassion. Others should not presume that they will be so lucky.