**In the Matter of the DISCIPLINE OF Paul R. INCE, Bar No. 04345.**

**No. 960298.**

Supreme Court of Utah.

April 10, 1998.

Stephen R. Cochell, Kate A. Toomey, Salt Lake City, for Utah State Bar.

Paul R. Ince, Park City, for himself.

ZIMMERMAN, Justice.

The Utah State Bar ("the Bar") appeals from a district court order rejecting the Bar's request for the disbarment of Paul R. Ince. In its findings of fact, the district court determined that Ince had committed not less than nineteen major acts of misconduct over a fifteen-month period, including misappropriating law firm and client funds for his own use and benefit, forging documents to conceal an illegal transfer of pension funds, and failing to disclose his misconduct to a subsequent employer. Despite finding that the generally appropriate level of discipline fixed by the Standards for Imposing Lawyer Sanctions was disbarment, the court concluded that mitigating factors weighed in favor of suspension. The court then suspended Ince for fifteen months, to be followed by twenty-four months of supervised probation. The Bar appeals, arguing that Ince should be disbarred. We agree and therefore reverse.

Before turning to the standard of review and analysis, we must engage in a fairly extensive discussion of the facts leading up to the disbarment proceeding. From 1984 through March of 1994, when his conduct was discovered, Ince was employed by the law firm of Callister, Duncan & Nebeker ("CD & N"). During several years of his employment, Ince's family suffered numerous health and financial problems. In September of 1992, Ince and his wife happened upon a house for sale in Summit County. Because of a dream Ince's wife had, the Inces became fixated on purchasing that house. They listed their own home for sale the next week, but by February of 1993 it had not sold. The Inces had insufficient funds to make the down payment on the Summit County house but became convinced that purchasing it would alleviate some of the difficulties they were suffering. At that time, Ince decided to use $20,000 from his pension plan toward the down payment.

Under ERISA and other applicable statutes, employees may not use pension funds to make payment for a personal residence. See generally 29 U.S.C. §§ 1106–08. However, Ince represented to Zions Bank, the pension fund trustee, that he intended to use the money solely for investment purposes to purchase a lot adjacent to the Summit County home. This would have constituted a permissible investment under the pension plan's self-directed investment option. To convince CD & N and Zions Bank that he had in fact purchased the adjacent lot, Ince produced a forged warranty deed and two forged quitclaim deeds.

After purchasing the home, the Inces continued to suffer financial difficulties. In an attempt to meet his financial obligations, Ince engaged in a series of actions designed to facilitate the misappropriation of money from CD & N, including the following: Ince collected payments totaling $1500 from firm clients but kept the money for himself. He obtained checks from CD & N's accounting department to cover fabricated fees or expenses and converted those funds to his personal use. For instance, Ince obtained a check for approximately $2600 drawn on CD & N's trust account by telling the firm that

the money was for a settlement closing and that funds from the closing would be returned to the trust account to cover the disbursement. He then forged the endorsement on the check, used the money for his mortgage payment, and failed to return the funds to the trust account.

Ince also manipulated an account denominated the "MSI Resolution Trust." Ince had established this account for the purpose of managing a client's funds for settlements with various creditors, including CD & N. Ince accepted two $5000 payments from the client—in July and December of 1993. He deposited roughly half of the July payment with CD & N as payment for services rendered and kept the remainder, and he kept all of the December payment, maintaining that it was a personal gift to him from the client.

In another incident involving the MSI account, Ince's brother, an attorney in Wyoming who was himself having financial and professional difficulties, convinced Ince to provide him with a check payable to his firm for $15,000. The check was drawn on the MSI account even though there was no connection between the client for whom the MSI account had been established and Ince's brother's firm. The check was presented for payment earlier than Ince anticipated and was dishonored due to insufficient funds. Ince's brother then persuaded Ince to write a letter to his Wyoming firm on CD & N letterhead providing a falsified explanation of why the first check had failed to clear.

In March of 1994, CD & N discovered Ince's misuse of the pension fund and the related forgeries. Ince offered to resign, and CD & N accepted this offer. After Ince's resignation, CD & N discovered additional misconduct. When confronted, Ince admitted the acts which had been discovered, but he did not volunteer information regarding his still undiscovered misdeeds. Eventually, Ince asked to speak to CD & N's management for the supposed purpose of making a full disclosure and arranging to repay all amounts he had misappropriated. Even then, however, he failed to reveal his misconduct regarding the two $5000 payments to the MSI account that were intended for payment of fees due to Ince's firm.[1] CD & N discovered these transactions in subsequent weeks, and when confronted, Ince agreed to make restitution. Ince sold the house in Summit County and other property to raise the necessary funds. All money owed to CD & N was repaid within a few months of Ince's resignation.

In May of 1994, after his misconduct had been discovered by CD & N, Ince contacted the Bar and met with the chief disciplinary counsel, to whom he disclosed the general nature of his misconduct. CD & N filed a complaint against Ince with the Bar a few weeks later. After his resignation in March, Ince began looking for a new job. In May of 1994, Ince interviewed for and eventually obtained a position in the Child Protection Division of the Utah Attorney General's office. While Ince implied during his interview that his departure from CD & N had occurred under disagreeable circumstances, he did not fully disclose the situation or give any indication that it had come about as a result of his own misconduct. The Attorney General's office hired Ince without contacting anyone at CD & N. A year and a half later, the Attorney General's office learned of Ince's misconduct and fired him.

The Bar filed a formal complaint against Ince in June of 1995. The district court conducted a trial in April of 1996. The court found that although disbarment was the "generally appropriate" sanction for Ince's misconduct, "mitigating circumstances outweighed the misconduct." Therefore, the court ordered Ince suspended for fifteen months, to be followed by twenty-four months of probation during which time Ince would have to disclose his misconduct prior to handling any client funds and would have to perform thirty hours of community service per month.

On appeal, the Bar argues that the district court gave undue weight to mitigating evidence and that Ince should be disbarred. The Bar also requests that we adopt a rule

---

1. Although Ince maintained that the second payment was intended as a gift to him, the trial court specifically found that the payments were intended for CD & N.

that absent extremely compelling circumstances, an attorney who intentionally misappropriates funds, whether from his client or from his law firm, should be disbarred. Ince declined to file a brief in opposition to the Bar's appeal but did appear at oral argument.

■ We begin our analysis by determining the correct standard of review. In 1993, this court adopted the Utah Rules of Lawyer Discipline and Disability ("Rules of Lawyer Discipline"). The Rules of Lawyer Discipline effected a major change in the procedure followed in attorney discipline cases by transferring jurisdiction over formal Bar complaints from the Board of Bar Commissioners to the district courts. *See In re Discipline of Babilis,* 951 P.2d 207, 211 (Utah 1997). Under the revised procedure, the district court conducts a trial and enters an order of discipline that is a final order unless appealed. *Id.* at 213. In our recent opinion *In re Discipline of Babilis,* we set forth a general outline of the revised procedures and addressed the application of the standard of review to these revised disciplinary procedures. We briefly reiterate that standard here.

■ Under article VIII, section 4 of the Utah Constitution, this court plays a special role in governing the practice of law. This role includes overseeing the discipline of persons admitted to practice law. *See id.* at 213. Thus, while we review the trial court's findings of facts under the clearly erroneous standard, *see State v. Pena,* 869 P.2d 932, 935–36 (Utah 1994), we reserve the right to draw different inferences from the facts than those drawn by the trial court. *See Babilis,* 951 P.2d at 211. With respect to the discipline actually imposed, our constitutional responsibility requires us to make an independent determination as to its correctness. *See id.*

Moving to our analysis, the Standards for Imposing Lawyer Sanctions ("the Standards"), which were adopted at the same time as the Rules of Lawyer Discipline, provide six rules to guide courts in determining the proper sanction to impose on an attorney who violates the standards of ethical conduct. *See id.* at 211. The first three rules set forth the purpose of the Standards, a general overview of the scope of the available sanctions, and the factors to be considered in imposing sanctions. The remaining three rules govern the determination of the sanctions to be applied in a given case. Rule 4 establishes the "generally appropriate" or presumptive level of discipline that should be imposed. Rule 5 addresses cases in which a prior order of discipline has been entered, and rule 6 provides for the consideration of aggravating and mitigating circumstances in the ultimate determination of what sanction should be imposed. *See id.* at 212–13.

■ Rules 4 and 6 are the rules with which we are concerned in this case. As stated earlier, the district court found that "absent aggravating and mitigating circumstances, the appropriate discipline is disbarment." Rule 4.2 sets forth the circumstances under which disbarment is generally appropriate. It states:

*Rule 4.2 Disbarment*

Disbarment is generally appropriate when a lawyer:

(a) knowingly engages in professional misconduct as defined in Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct [2] with the intent to benefit the lawyer or another or to deceive the court, and causes serious or potentially serious injury to a party, the public, or the legal system, or causes serious or potentially serious interference with a legal proceeding; or

(b) engages in serious criminal conduct, a necessary element of which in-

---

2. The referenced portion of rule 8.4 states:

It is professional misconduct for a lawyer to:
　(a) Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
　. . .;

　(d) Engage in conduct that is prejudicial to the administration of justice;
　(e) State or imply an ability to influence improperly a government agency or official;
　(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law[.]

cludes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution, or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

    (c) engages in any other intentional misconduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law.

Standards for Imposing Lawyer Sanctions, Rule 4.2. As we noted in *Babilis*, there is no requirement that all three subdivisions of rule 4.2 be violated for disbarment to be the presumptively appropriate sanction. *See* 951 P.2d at 215. A finding that any one of (a), (b), or (c) has been violated is sufficient. *See id.*

■ In this case, Ince's conduct clearly falls within rule 4.2. Most notably, rule 4.2(b) refers to "serious criminal conduct, a necessary element of which includes ... false swearing, misrepresentation, fraud, extortion, misappropriation, or theft." Ince committed numerous crimes involving these elements. For example, he committed theft on several occasions by taking for his own use and benefit payments from clients that were supposed to be transmitted to CD & N. *See* Utah Code Ann. § 76-6-405 ("A person commits theft if he obtains or exercises control over property of another by deception and with a purpose to deprive him thereof."). He also stole client funds when he billed Zions Bank for fabricated expert witness fees.

■ In *Babilis*, we stated that in the absence of truly compelling mitigating circumstances, the intentional misappropriation of client funds is an act that merits disbarment. 951 P.2d at 217. The Bar urges us to adopt the same posture toward intentional misappropriation of law firm funds, and we do so today. The fact that the majority of the money Ince stole came from his law firm rather than from a client neither changes the essential nature of his conduct nor makes it any less serious. The conduct still falls within the confines of rule 4.2(b).

■ In addition to committing theft, Ince also committed several acts of forgery—altering a trust deed, forging quitclaim and warranty deeds, and forging an endorsement on a check. *See* Utah Code Ann. § 76-6-501 (defining forgery). Ince's acts could have been prosecuted as felonies or misdemeanors and clearly constitute serious criminal conduct for the purposes of rule 4.2(b). Furthermore, several of Ince's acts, although not criminal in nature, satisfy the requirements of 4.2(c). In particular, Ince's conduct with regard to the $15,000 check he wrote against the MSI account and the subsequent letter explaining why that check bounced were intentional acts involving dishonesty and deceit. These acts seriously adversely reflect on Ince's fitness to practice law, thereby making disbarment the presumptively appropriate sanction.

Once a trial court determines the presumptive level of discipline, it may apply rule 6 and consider the aggravating and mitigating circumstances in deciding what sanction should ultimately be imposed. Because rule 6 does not provide any guidance as to how these circumstances are to be weighed, the process of applying them is necessarily somewhat subjective. However, one of the concerns that prompted the adoption of the present Standards was that under the prior disciplinary regime, there was no detailed set of guidelines that defined the sanction generally appropriate for a given type of misconduct. Thus, discipline under the old regime had something of an ad hoc quality, and there was the possibility, if not the probability, that similarly situated individuals might not receive similar sanctions. *See Babilis,* 951 P.2d at 211-12; *see id.* at 218 (Zimmerman, J., concurring). Although the new Standards are intended to preserve a measure of flexibility in assigning sanctions, the whole basis for their adoption was to avoid the uncertainty that existed under the old rules. Therefore, we offer the following guidance as to the application of aggravating and mitigating circumstances under rule 6.

■ To justify a departure from the presumptive level of discipline set forth in the Standards, the aggravating and mitigating

factors must be significant. In this case, we find that the district court accorded too much weight to mitigating factors which were not particularly compelling. This is especially true given the number of aggravating factors that existed. Thus, the weight of the mitigating factors is at least balanced by the aggravating factors. Under such circumstances, no adjustment to the presumptively appropriate level of discipline is warranted.

To elaborate, the district court found that the following mitigating factors weighed in favor of suspension: Ince (1) had no previous record of discipline; (2) had personal or emotional problems during the relevant time frame; (3) made timely, good faith restitution of the money owed to his employer; (4) enjoyed a good reputation both before and after his misconduct; (5) exhibited remorse and interim reform and did not commit any further misconduct; and (6) demonstrated good work in the Child Protection Division of the Attorney General's office following his resignation from CD & N.

The court also found the following aggravating factors: (1) Ince's conduct demonstrated a dishonest motive (the misconduct was motivated by the desire to support a lifestyle he could not afford); (2) Ince engaged in a pattern of misconduct; (3) Ince committed multiple offenses—nineteen major acts of misconduct over a fifteen-month period; and (4) the conduct was illegal.

■ ■ There are a number of general statements which can be made about the mitigating factors the court found to exist in this case and how much weight they should be accorded. First, Ince's restitution should not be given much weight because it was made only after his misconduct had been discovered and he had been confronted by CD & N. After an attorney's misconduct is discovered, restitution can be characterized simply as the "honesty of compulsion" and may be evidence only of the lawyer's ability to raise the money or desire to avoid being disbarred rather than of a sincere desire to rectify the wrongdoing. *In re Wilson*, 81 N.J. 451, 409 A.2d 1153, 1156 (1979). On the other hand, an attorney who reports his own misconduct prior to discovery and attempts to make restitution even if he lacks the means to do so completely should have those efforts accorded greater weight in the determination of the sanction to be imposed.

The same reasoning applies to Ince's voluntary reporting of his misconduct to the Bar. This disclosure took place only after his misconduct had been discovered by CD & N. At that point, Ince could reasonably anticipate that CD & N would report him to the Bar. Therefore, his disclosure was self-serving. In contrast, an attorney who reports his own misconduct to the Bar prior to discovery, perhaps knowing that the misconduct might not ever be discovered, would certainly be entitled to have this voluntary disclosure weighed heavily as a mitigating factor.

■ ■ Furthermore, Ince's supposed interim remorse and reform are not compelling. For example, when first confronted by CD & N with evidence of his misconduct, Ince was not forthcoming. He repeatedly admitted to acts of misconduct only when confronted with specific evidence and was never completely willing to admit to undiscovered misconduct.[3] He then failed to disclose the true reason for his resignation from CD & N to the Attorney General. Rather than seeming truly sorry for his conduct and admitting to it, Ince seemed sorry only that he had been caught.

As for reform, Ince's position and reputed good work with the Attorney General's office are not entitled to significant weight. Because his position with the Attorney General did not involve control over client or state funds, Ince has not demonstrated that he would not fall victim to the same temptations if he again encountered financial difficulties at home. The fact that witnesses testified that Ince did good work at the Attorney General's office is similarly unconvincing as these character witnesses were not aware of the full extent of Ince's malfeasance. Without this knowledge, their opinions expressing

---

**3.** Although Ince did eventually disclose several incidents of undiscovered misconduct to CD & N, he did so only after significant prodding and was never forthright with respect to his misconduct involving the MSI account.

disapproval of the Bar's efforts to revoke Ince's license were not fully informed.

In the final balance, we must consider all of the circumstances in light of the Standards for Imposing Lawyer Sanctions. The primary purposes promoted by the Standards are to protect the public and the judicial system and to uphold high standards of professionalism. The presumptive sanctions the Standards set forth for various types of misconduct are carefully calculated to further those purposes. None of these purposes would be well-served were we to uphold the decision of the district court and allow an attorney who knowingly violated the rules of professional conduct and stole money to support a lifestyle beyond his means to continue practicing in the absence of a significant imbalance of mitigating and aggravating circumstances. Therefore, Ince must be disbarred.

HOWE, C.J., and DURHAM and RUSSON, JJ., concur.

STEWART, J., concurs in the result.