*This opinion is subject to revision before publication in the Pacific Reporter*

**2017 UT 10**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Discipline of JOSEPH P. BARRETT

OFFICE OF PROFESSIONAL CONDUCT,
*Appellant and Cross-Appellee,*

*v.*

JOSEPH P. BARRETT,
*Appellee and Cross-Appellant.*

No. 20150190
Filed February 22, 2017

On Direct Appeal

Third District, Salt Lake
The Honorable Robert P. Faust
No. 130907818

Attorneys:

Todd Wahlquist, Salt Lake City, for appellant

Robert K. Hilder, Park City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE PEARCE joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶ 1 Attorney Joseph Barrett exchanged legal services for construction work on his home and yard, thereby depriving his law firm, Snow, Christensen & Martineau P.C. (SCM), of the legal fees accrued from those cases. The district court suspended Mr. Barrett from the practice of law after it concluded that Mr. Barrett's conduct violated

rule 8.4(c) of the Utah Rules of Professional Conduct. The Office of Professional Conduct (OPC) appealed, urging us to hold that the intentional or knowing misappropriation of firm funds, like the intentional or knowing misappropriation of client funds, creates a presumption of disbarment. Mr. Barrett cross-appealed, arguing that the district court's factual findings were clearly erroneous and a result of bias and that suspension was too harsh a sanction. We affirm the district court in part, reverse in part, and uphold the sanction of suspension.

## BACKGROUND

¶ 2   The misconduct allegations in this case stem from three independent situations: two involving legal services Mr. Barrett provided to clients in exchange for construction work on his home and yard, and one involving Mr. Barrett's reimbursement request for a phone call with a potential client.

¶ 3   With respect to the first situation, Mr. Barrett began providing legal services to Richard Williams in June 2007 when Mr. Williams retained SCM and Mr. Barrett to represent his son in a criminal matter. Over the next three years, Mr. Barrett worked on that case, a collection matter for Mr. Williams's company, and new criminal matters for Mr. Williams's son. In June 2010, Mr. Barrett requested that the firm write off over $7,000 from Mr. Williams's account. Around that time, Mr. Williams's brother-in-law began building a wrought-iron railing for Mr. Barrett's home, but he was unable to finish it. In July 2010, Mr. Williams wrote a check to Mr. Barrett for $3,500, which Mr. Barrett deposited into his personal account. According to Mr. Barrett, Mr. Williams proposed that his brother-in-law work on the railing as a "kind gesture" and Mr. Williams insisted on paying Mr. Barrett $3,500 so he could hire someone else to finish the job. Mr. Barrett claims that he wrote off Mr. Williams's bills as a professional courtesy so Mr. Williams would continue to refer clients to Mr. Barrett and because he believed it was the compassionate thing to do. But by 2012, of the $8,612.07 that SCM billed to Mr. Williams's account, Mr. Barrett had written off $7,912.07. And Mr. Williams had paid SCM only $700 while paying Mr. Barrett personally $3,500.

¶ 4   Moreover, Mr. Williams's testimony was contrary to Mr. Barrett's. Mr. Williams testified that he had an unwritten agreement with Mr. Barrett to exchange work on the railing for Mr. Barrett's legal services. Mr. Williams further testified that he

understood the $3,500 he provided to Mr. Barrett to be for the balance of what he owed Mr. Barrett for his legal work.

¶ 5    The second situation involves legal services Mr. Barrett provided to David Petersen. Mr. Barrett began legal work for Mr. Petersen in November 2010, when Mr. Petersen hired Mr. Barrett's firm to represent him in a custody case. Several months later, Mr. Petersen started building a shed at Mr. Barrett's home. Shortly afterward, Mr. Barrett requested that the firm write off about half of Mr. Petersen's bill. Over the next couple of months, Mr. Barrett requested that SCM write off the rest of Mr. Petersen's bill, and the firm refunded his $2,500 retainer. Mr. Barrett paid Mr. Petersen approximately $5,000 for the shed, which had cost Mr. Petersen $15,170.63 to build. In all, Mr. Barrett wrote off $8,913.54 from Mr. Petersen's account at SCM. Mr. Barrett stated that he wrote off Mr. Petersen's bills and refunded his retainer because he believed Mr. Petersen would be unable to pay and needed the money to visit his son. Mr. Petersen, however, testified that he had an agreement with Mr. Barrett to build the shed in exchange for legal services.

¶ 6    The third and final situation arose in January 2012 when Mr. Barrett requested reimbursement for a business development lunch in California that he did not attend. Mr. Barrett's wife attended the lunch, and Mr. Barrett stated that he discussed business matters with a potential client over a phone call that took place during the lunch.

¶ 7    In February 2012, SCM's president confronted Mr. Barrett about some of his reimbursement requests and subsequently reported him to the OPC. After an investigation, the OPC filed a complaint in district court in which it requested that Mr. Barrett be sanctioned based on his dealings with Mr. Petersen and Mr. Williams and the reimbursement request for the California lunch, which the OPC argued involved "dishonesty and deceit." The district court found that Mr. Barrett accepted payment and construction services in exchange for his legal work, thereby misappropriating firm funds. Regarding the reimbursement request for the lunch in California, the court concluded that Mr. Barrett violated Utah Rule of Professional Conduct 8.4(c) by withholding "information that would allow [SCM] to properly evaluate whether the expense was legitimate."

¶ 8    All told, the district court found that Mr. Barrett committed three different acts of attorney misconduct, each of which violated rule 8.4(c). The court then turned to the issue of the appropriate sanction, which requires the district court to consider the professional duty that

the attorney has violated, the attorney's mental state, the potential or actual injury caused by the lawyer's misconduct, and any applicable aggravating or mitigating factors. SUP. CT. R. PROF'L PRACTICE 14-604. The court found that Mr. Barrett acted knowingly and intentionally, and it listed as aggravating circumstances a "[d]ishonest or selfish motive," the fact that there were multiple offenses, and "[r]efusal to acknowledge the wrongful nature of the misconduct." The court also found four mitigating circumstances: (1) that Mr. Barrett did not have a prior record; (2) that he had made restitution to his firm and sought "to rectify the consequences of [his] misconduct"; (3) that he had cooperated with the OPC; and (4) that he had a "partial understanding of actions he should have taken with his firm to avoid the problems."

¶ 9    The district court concluded that Mr. Barrett's actions constituted "conduct involving dishonesty, fraud, deceit, or misrepresentation," but, given that Mr. Barrett did not misappropriate client funds, concluded that "disbarment . . . [was] not mandated in this case." After considering the duty that Mr. Barrett violated and Mr. Barrett's mental state, and weighing the aggravating and mitigating circumstances, the court imposed a 150-day suspension, which both parties appeal.

¶ 10    We have jurisdiction over attorney discipline matters under Utah Code section 78A-3-102(3)(c).

## STANDARD OF REVIEW

¶ 11    Because of our constitutional authority in attorney discipline cases, "we employ a unique standard of review." *In re Discipline of Corey*, 2012 UT 21, ¶ 23 n.13, 274 P.3d 972. We presume the district court's findings of facts to be correct "unless they are arbitrary, capricious, or plainly in error," but we give less deference to the findings than we otherwise would and "reserve the right to draw inferences from basic facts which may differ from the inferences drawn" by the district court. *In re Discipline of Babilis*, 951 P.2d 207, 213 (Utah 1997) (citation omitted). In reviewing the sanction imposed, "our constitutional responsibility requires us to make an independent determination as to its correctness." *In re Discipline of Ince*, 957 P.2d 1233, 1236 (Utah 1998).

## ANALYSIS

¶ 12    Mr. Barrett argues that we should hold that the district court's findings of fact were clearly erroneous and the result of bias, prejudice, or misconduct on the part of the district judge. Mr. Barrett

urges us to draw different inferences from the facts than the district court did and find that he did not engage in misconduct and that suspension is not warranted. The OPC urges us to uphold the district court's findings of fact but find that disbarment is the appropriate sanction.

¶ 13    First, we reject Mr. Barrett's attack on the district court's findings of fact, in the process finding no support for Mr. Barrett's allegations of bias. Second, we decline to extend our well-settled rule that intentional or knowing misappropriation of client funds is a presumptively disbarrable offense to the circumstances of this case. Third, we agree with the district court that a 150-day suspension is the appropriate sanction for Mr. Barrett's misconduct.

## I. THE DISTRICT COURT'S FINDINGS WERE NEITHER ERRONEOUS NOR THE PRODUCT OF BIAS OR MISCONDUCT

¶ 14    Faced with a slew of unfavorable factual findings by the district court, Mr. Barrett urges us to draw contrary inferences from the facts and hold that the district court's findings were clearly erroneous. Mr. Barrett argues that the district court erred in three ways: (1) making erroneous credibility determinations, (2) originally marking two disputed facts as "stipulated," and (3) doing independent factual research to determine whether SCM is a partnership or a corporation.

¶ 15    Mr. Barrett spends a large portion of his brief arguing that the district court's findings were erroneous and the result of bias, prejudice, or misconduct on the part of the judge. But our review of the record confirms the district court's findings that Mr. Barrett entered into deals with Mr. Petersen and Mr. Williams to exchange construction work for legal services. We find no error in the district court's crediting the testimony of two witnesses who were on good terms with Mr. Barrett, had benefited greatly from their deals with him, and were apparently reluctant to land him in hot water. We also find no error in the district court's discounting Mr. Barrett's self-serving account of his own conduct, or in its drawing the inference that Mr. Barrett's explanation of both the construction services that Mr. Petersen and Mr. Williams performed for him and the $3,500 check that Mr. Williams gave him lacked credibility. And we agree with the district court as to the purpose of the $3,500 check from Mr. Williams—namely, that it was payment for legal fees, and not, as Mr. Barrett asserted, payment to finish the wrought-iron fence. Therefore, we will not disturb the district court's findings of fact.

¶ 16   Mr. Barrett also argues that the district court erred in its disciplinary order when it originally, albeit mistakenly, characterized two facts as being stipulated before moving them to the "additional findings of fact" section. We see no significance in this misstep. There was ample evidence in the form of testimony from Mr. Williams and Mr. Petersen to support these two facts—that SCM "was unaware that Mr. Williams paid $3,500 directly to Mr. Barrett for legal services" and that "[i]nitially, it was anticipated that a shed would be built for approximately $5,000"—and no indication that the district court failed to give careful consideration to the evidence bearing on these factual findings. Additionally, Mr. Barrett has shown no error resulting from the facts originally being listed as stipulated. The evidence does not support that the inclusion of the facts in the "stipulated facts" section was the product of bias. Indeed, the district court, after meeting with the parties for over an hour regarding the proposed findings of fact, offered to read the findings into the record formally, and Mr. Barrett's counsel declined.

¶ 17   Mr. Barrett's final argument about the district court's findings involves the court's extra-record research related to what duty Mr. Barrett owed to his colleagues at SCM. At the sanctions hearing, the district court judge stated that he "looked up to see if Snow Christensen was a partnership or a corporation because we all know there's fiduciary duties between partners." Despite his finding that SCM is a corporation, the judge stated that he believes "that outstanding principle still is there, . . . that we owe to the people with whom we have business dealings . . . not [to] violate the trust and confidence that's reposed in those relationships." This finding, while possibly an improper use of judicial notice, did not affect the judge's determination of which sanction was appropriate. There is no indication that the judge relied on it in any meaningful way; indeed, he did not even mention it in his findings of fact or conclusions of law, or in his analysis of aggravating and mitigating factors.[1]

---

[1] While the court's independent research in this case was, in our view, harmless, and while—depending on the source the court consulted—the fact that it found may have been properly noticeable, we caution courts to avoid independent factual research. UTAH CODE OF JUDICIAL CONDUCT Canon 2, r. 2.9(C) ("A judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed.").

(cont.)

¶ 18   We find no bias or prejudice in the district court's findings of fact, and our independent review leads us to the conclusion that the court's factual findings were correct.

## II. SUSPENSION IS THE APPROPRIATE SANCTION

¶ 19   The district court found that Mr. Barrett violated rule 8.4(c) of the Utah Rules of Professional Conduct, which states that "[i]t is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation." The court determined that suspension was the appropriate sanction for Mr. Barrett based on the nature of the injury he inflicted, the aggravating and mitigating factors, and the fact that Mr. Barrett did not misappropriate client funds. We agree with the district court that suspension is the appropriate sanction in this case.

¶ 20   When determining the appropriate sanction, we take a two-fold approach using Rules of Professional Practice 14-604 and 14-605. Under rule 14-604, we assess "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." In connection with this analysis, we look to rule 14-605, which outlines the "generally appropriate" sanctions "[a]bsent aggravating or mitigating circumstances."

¶ 21   Rule 14-605(a) provides that disbarment is generally appropriate when a lawyer

> (a)(1) knowingly engages in professional misconduct as defined in Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct with the intent to benefit the lawyer or another or to deceive the court, and causes serious or potentially serious injury to a party, the public, or the legal system, or causes serious or potentially serious interference with a legal proceeding; or

---

Judges may take judicial notice only of facts that are "not subject to reasonable dispute" because they are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." UTAH R. EVID. 201(b).

(a)(2) engages in serious criminal conduct, a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution, or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

(a)(3) engages in any other intentional misconduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law.

¶ 22    Suspension, on the other hand, is generally appropriate when a lawyer

(b)(1) knowingly engages in professional misconduct as defined in Rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct and causes injury or potential injury to a party, the public, or the legal system, or causes interference or potential interference with a legal proceeding; or

(b)(2) engages in criminal conduct that does not contain the elements listed in Rule 14-605(a)(2) but nevertheless seriously adversely reflects on the lawyer's fitness to practice law.

SUP. CT. R. PROF'L PRACTICE 14-605.

¶ 23    We turn first to the conduct for which disbarment is generally appropriate. Relevant to this analysis, we note that the district court found that Mr. Barrett violated his duty under rule 8.4(c) of the Utah Rules of Professional Conduct by engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation." We also note that the district court found that Mr. Barrett acted knowingly and intentionally and that he caused actual injury to SCM by depriving the firm of the legal fees that Mr. Williams and Mr. Petersen owed. With our review of the record in this matter in mind, we see no reason to deviate from the district court's findings.

¶ 24    Therefore, and in light of these findings, rules 14-605(a)(1) and (a)(2) do not apply. Rule 14-605(a)(1) addresses violations of rule 8.4(a), (d), (e), or (f) of the Rules of Professional Conduct, but the

district court found that Mr. Barrett violated only rule 8.4(c). And rule 14-605(a)(2) requires a determination that the lawyer's actions were "serious[ly] criminal," but the district court did not make that finding in this case, and, in any event, the OPC does not seriously contend that rule 14-605(a)(2) applies to Mr. Barrett's actions.

¶ 25    It is a closer question whether Mr. Barrett violated rule 14-605(a)(3), which punishes "intentional misconduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice law." We have frequently stated that intentional or knowing misappropriation of client funds creates a presumption of disbarment under this section, noting that "it strikes at the very foundation of the trust and honesty that are indispensable to the functioning of the attorney-client relationship and, indeed, to the functioning of the legal profession itself." *In re Discipline of Babilis*, 951 P.2d 207, 217 (Utah 1997); *see also In re Discipline of Corey*, 2012 UT 21, ¶ 21 & n.9, 274 P.3d 972. In its brief to this court, the OPC asked us to extend this presumption to all acts of intentional or knowing misappropriation of firm funds. At oral argument, the OPC pressed the stronger position that we have *already* recognized that misappropriation of firm funds is a presumptively disbarrable offense, citing our opinion in *In re Discipline of Ince*, 957 P.2d 1233 (Utah 1998).

¶ 26    In *Ince*, we imposed disbarment after finding that the attorney misappropriated money from both his firm and his clients, thereby engaging in criminal conduct and actions that "seriously adversely reflect on [the lawyer's] fitness to practice law." *Id.* at 1237. We noted that whether "the majority of the money [the attorney] stole came from his law firm rather than from a client neither changes the essential nature of his conduct nor makes it any less serious," and we therefore adopted the position that intentional misappropriation of firm funds merits disbarment. *Id.* But that language was merely dicta, which we now reject, noting that *Ince*'s holding relied on facts that are not applicable to Mr. Barrett's case.

¶ 27    First, although we stated in *Ince* that stealing money from a firm rather than from clients was not "any less serious," we did so in the context of the rule regarding criminal conduct, as the lawyer had committed several acts of forgery, which "could have been prosecuted

as felonies or misdemeanors."[2] *Id.* And although *Ince* also dealt with actions that "seriously adversely reflect on the lawyer's fitness to practice law," those involved writing checks against client accounts, so disbarment was warranted on that basis. *Id.* Our holding in *Ince* was therefore in keeping with our longstanding policy of treating intentional or knowing misappropriation of client funds as a presumptively disbarrable offense. *See Babilis*, 951 P.2d at 217.

¶ 28　Second, we clarify today that not all misappropriation is created equal. Misappropriation of firm funds does not "undermine the foundations of the profession and the public confidence" in the same way that misusing client funds does. *Id.* A presumption of disbarment for intentional or knowing misappropriation of client funds is necessary to protect the "foundations of the profession and the public confidence that is essential to the functioning of our legal system," and we have placed it among the top of our sanctionable offenses as a way of putting attorneys on notice that such actions are "always indefensible." *Id.* But the same policy concerns do not arise where no client money is at issue, and we want to leave no doubt in stating that intentional or knowing misappropriation of client funds is intolerable. Thus, we will not extend *Ince* to mean that where an attorney has misappropriated firm funds but not client funds, the presumption of disbarment must apply. In this case, Mr. Barrett did not misappropriate client funds. We therefore decline to extend *Ince*'s ruling to hold that disbarment is the appropriate sanction whenever an attorney misappropriates firm funds, and we find that Mr. Barrett's knowing and intentional misappropriation of firm funds does not fall within rule 14-605(a)(3).

---

[2] We also stated that Mr. Ince's "taking for his own use and benefit payments from clients that were supposed to be transmitted to [his firm]" was an example of criminal conduct because it constituted theft. *In re Discipline of Ince*, 957 P.2d 1233, 1237 (Utah 1998). Although Mr. Barrett's conduct is similar to Mr. Ince's in that respect, we note that in this case, the OPC did not argue that Mr. Barrett's conduct was criminal. The OPC briefly mentioned rule 14-605(a)(2) as a basis for Mr. Barrett's sanction but—noting that there is no "criminal conviction for misappropriation under paragraph (a)(2),"—it focused its prosecution entirely on sections (a)(1) and (a)(3). We therefore will not consider Mr. Barrett's misappropriation as criminal conduct for purposes of our rule 14-605 analysis.

¶ 29    Mr. Barrett's conduct also does not fit into rule 14-605(b)—the rule governing the circumstances under which suspension is "generally appropriate." As noted above, his conduct was not a violation of Rules of Professional Conduct 8.4(a), (d), (e), or (f) as required by rule 14-605(b)(1), and there was no determination that his conduct was criminal as required by rule 14-605(b)(2).

¶ 30    Because rule 14-605 does not provide a "generally appropriate" sanction for Mr. Barrett's conduct, we focus on the factors laid out in rule 14-604 to determine which sanction is appropriate. As we have explained, rule 14-604 requires us to determine the appropriate sanction with reference to "(a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors." In this case, the duty violated by misappropriating firm funds is key. As noted above, this violation is less serious than misappropriating client funds and, while still a serious violation, merits a lesser spot on the sanctions pyramid.

¶ 31    But Mr. Barrett's intentional and knowing mental state prevents the sanction from dropping further in severity. *See Long v. Ethics & Discipline Comm. of the Utah Supreme Court*, 2011 UT 32, ¶ 67, 256 P.3d 206 (stating that reprimand is generally appropriate when lawyer acted negligently); *In re Complaint Against Cassity*, 875 P.2d 548, 551 (Utah 1994) (imposing reprimand where lawyer failed to remit client fees but did so in the context of a fee dispute, not intentional misappropriation). Mr. Barrett has also not raised compelling mitigating factors that would merit decreasing the severity of the sanction.

¶ 32    Although Mr. Barrett's misappropriation of firm funds is not deserving of the "professional death-sentence" of disbarment, *Corey*, 2012 UT 21, ¶ 40, we hold that suspension is appropriate. Intentional or knowing misappropriation of firm funds is a serious offense, and we conclude that Mr. Barrett's intentional and knowing mental state, combined with the actual injury caused to his firm from losing the client funds that were due to it, along with the lack of compelling mitigating factors, merits a serious sanction. We therefore agree with the district court that the aggravating and mitigating factors do not justify deviating from suspension, and we uphold the court's order of a 150-day suspension.

¶ 33    However, we part ways with the district court in two respects. First, we do not find that Mr. Barrett's repayment of

misappropriated funds constituted the mitigating circumstance that there has been a "timely good faith effort to make restitution." *See* SUP. CT. R. PROF'L PRACTICE 14-607(b)(4). We have stated that restitution is not a mitigating factor "where there is no evidence to show that remorse was [the attorney's] motivation for restoring the funds." *In re Discipline of Lundgren*, 2015 UT 58, ¶ 22, 355 P.3d 984; SUP. CT. R. PROF'L PRACTICE 14-607(c)(1). "After an attorney's misconduct is discovered, restitution can be characterized simply as the 'honesty of compulsion' and may be evidence only of the lawyer's ability to raise the money or desire to avoid being disbarred rather than of a sincere desire to rectify the wrongdoing." *Ince*, 957 P.2d at 1238. Mr. Barrett repaid SCM only after the firm accused him of misconduct, not as a result of self-reporting. Therefore, we will not consider his restitution as a mitigating factor.

¶ 34   Second, though we find suspension appropriate for the Williams and Petersen matters, we reverse the district court's holding that Mr. Barrett violated rule 8.4(c) with regard to the California client lunch. The district court found that Mr. Barrett's reimbursement request was deceptive because it went against the firm's "informal understanding" that an attorney should personally attend client development lunches. But there is no evidence that SCM's policies prohibited Mr. Barrett from requesting reimbursement for a meal that he did not attend when he had spoken to the potential client on the phone. And in the absence of evidence that Mr. Barrett intentionally deceived the firm as to his presence at the lunch, we do not believe his conduct rises to the level that a sanction is necessary. We therefore find that Mr. Barrett did not violate rule 8.4(c) as to the third allegation.

## CONCLUSION

¶ 35   We reverse the district court's finding that Mr. Barrett's requesting reimbursement for a client lunch that he did not personally attend constituted misconduct, but we affirm the district court's determination that Mr. Barrett misappropriated firm funds by accepting construction work from firm clients and then causing the firm to write down their bills, and we uphold the district court's order of suspension.

———————————