*This opinion is subject to revision before final publication in the Pacific Reporter*

**2018 UT 6**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

IN THE MATTER OF THE DISCIPLINE OF RICHARD LAJEUNESSE, #7408

OFFICE OF PROFESSIONAL CONDUCT,
*Appellant,*

*v.*

RICHARD LAJEUNESSE,
*Appellee.*

No. 20160264
Filed February 16, 2018

On Direct Appeal

Third District, Salt Lake
The Honorable Andrew H. Stone
No. 130905706

Attorneys:

Barbara L. Townsend, Salt Lake City, for appellant

Elizabeth A. Bowman, Salt Lake City, for appellee

Heidi E. C. Leithead, Salt Lake City, for amicus curiae, Workers
Compensation Fund

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the Court, in
which CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, JUDGE MORTENSEN,
and JUDGE HAGEN joined.

Having recused himself, JUSTICE PEARCE does not participate herein;
COURT OF APPEALS JUDGE DAVID N. MORTENSEN sat.

Due to her retirement, JUSTICE DURHAM did not participate herein;
COURT OF APPEALS JUDGE DIANA HAGEN sat.

JUSTICE PETERSEN became a member of the Court on November 17,
2017, after oral argument in this matter, and accordingly did not
participate.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the Court:

¶1    This is an appeal in an attorney discipline proceeding involving Richard LaJeunesse. LaJeunesse has been licensed to practice law in Utah since 1996. From 2001 through 2012, he was the Presiding Administrative Law Judge (ALJ) and Director of the Adjudication Division of the Utah Labor Commission. In that capacity he adjudicated workers' compensation disputes between occupationally injured employees and their employers or insurance carriers. He also oversaw the work of other ALJs.

¶2    This case arises out of a policy adopted by LaJeunesse in his work as Presiding ALJ and Director of the Adjudication Division. The policy concerned ALJs' treatment of medical panel reports submitted under Utah Code section 34A-2-601(2). That provision requires an appointed medical panel to make "a report in writing to the administrative law judge in a form prescribed by the Division of Adjudication." UTAH CODE § 34A-2-601(2)(b)(i). It also directs the ALJ to "promptly distribute full copies" of that report to all parties and their attorneys. *Id.* § 34A-2-601(2)(d)(i). LaJeunesse interpreted this statute to leave room for an ALJ to reject reports submitted by medical panels and to request changes to the form and verbiage in a report—without submitting the rejected report to the parties or their attorneys. Applying this policy, another ALJ working under LaJeunesse's supervision (Debbie Hann) rejected reports she deemed noncompliant and requested medical panels to submit replacement reports. In those instances she did not provide a copy of the rejected report to the parties or to their counsel. LaJeunesse knew of three of these instances. And he personally participated in rejecting a medical panel report and requesting a new report in one instance.

¶3    A party in one of these cases discovered that a medical panel report had been rejected without being distributed to the parties. An audit and investigation ensued. The Utah Labor Commission ultimately concluded that the policy adopted by LaJeunesse ran afoul of explicit and implicit mandates of the Workers' Compensation Act, including the requirement that ALJs "promptly distribute full copies" of medical panel reports to parties and their attorneys. *Id.* It also faulted LaJeunesse for embracing a policy that allowed ALJs to destroy medical panel reports without informing the parties of the existence of such reports or of the nature and extent of proposed changes to them. Thus, the Commission repudiated the policy adopted by LaJeunesse, instructing ALJs that they could no longer withhold medical panel reports. And the

Commission ultimately terminated LaJeunesse for his role in adopting and implementing a contrary policy.

¶4 LaJeunesse was then subjected to a bar complaint. After an initial investigation by the Office of Professional Conduct (OPC) a Notice of Informal Complaint was issued against LaJeunesse. The complaint charged LaJeunesse with violating rule 8.4(d) of the Utah Rules of Professional Conduct by engaging in "conduct that is prejudicial to the administration of justice."

¶5 That charge was heard by a screening panel of the Ethics and Discipline Committee, which found probable cause to conclude that LaJeunesse had violated rule 8.4(d). A petition was subsequently filed by the OPC in the Third District Court. The case was heard by Judge Andrew Stone. Judge Stone concluded that LaJeunesse had not engaged in conduct prejudicial to the administration of justice. He held that LaJeunesse had a sound legal basis for the policy he had adopted or, alternatively, that a lawyer exercising quasi-judicial power (as an ALJ) cannot be found in violation of rule 8.4(d) merely for adopting a reasonable interpretation of a statutory scheme that is ultimately shown to be incorrect.

¶6 We affirm on this latter ground. We conclude that a lawyer cannot be charged with conduct prejudicial to the administration of justice for adopting a good faith but mistaken interpretation of a law that governs the lawyer's performance of quasi-judicial authority. *Cf. In re Worthen*, 926 P.2d 853, 870 (Utah 1996) (adopting a similar standard for assessing judicial misconduct).

I

¶7 LaJeunesse's case was adjudicated in a five-day bench trial in February 2016. At the close of the trial Judge Stone entered extensive factual findings. We summarize the background and findings in detail below with quotations from the district court record.

A

¶8 ALJs hear contested claims for workers' compensation and may appoint a medical panel to advise them regarding the contested medical issues in the case. The medical panels are considered "adjuncts" to the ALJ at the commission level. But "[t]he final responsibility of making the decision as to the issues in such a proceeding is given to the Commission," and the medical panel may not take over this responsibility of the Commission. *IGA Food Fair v.*

*Martin*, 584 P.2d 828, 830 (Utah 1978) (citation omitted), *abandoned on other grounds by Allen v. Indus. Comm'n*, 729 P.2d 15 (Utah 1986).

¶9    Before referring a case to a medical panel, the ALJ makes interim findings resolving any factual disputes. The medical panel is bound by those findings; it is left only to resolve any outstanding medical issues. The ALJ, on the other hand, is not required to accept the medical panel's conclusions if "substantial conflicting evidence in the case supports a contrary finding." UTAH CODE § 34A-2-601(2)(e)(ii).

¶10   By statute, the medical panel is to make "a report in writing to the administrative law judge in a form prescribed by the Division of Adjudication" and "additional findings as the administrative law judge may require." *Id.* § 34A-2-601(2)(b). The "administrative law judge shall promptly distribute full copies of a report submitted to the administrative law judge" to all relevant parties and their attorneys. *Id.* § 34A-2-601(2)(d)(i). The parties then have 20 days to file "a written objection to the report." *Id.* § 34A-2-601(2)(d)(ii). If no written objection is made within the prescribed period, then "the report is considered admitted in evidence." *Id.* § 34A-2-601(2)(d)(iii).

¶11   In 2011 and 2012, there were numerous complaints about the quality of medical reports provided by medical panels to ALJs. Common complaints went to concerns that medical panels assumed facts beyond or contrary to the ALJ's interim findings, or that opinions were "phrased in terms of percentages instead of legally required conclusions."

¶12   In January 2012, LaJeunesse and another ALJ, Hann, discussed whether the statute permitted an ALJ to reject a report and request changes to its form in order to comply with the legal requirements applicable to medical reports. LaJeunesse reached the conclusion that such a determination lay within the ALJ's discretion and agreed with ALJ Hann that she could do so. After permitting ALJ Hann to reject medical reports without notifying the parties, LaJeunesse also personally rejected and requested new medical reports in one instance. These actions gave rise to the case before us.

B

¶13   The Commission and the district court both determined that LaJeunesse "had a good faith belief that his statutory interpretation permitting the return of a signed report to a medical panel for technical revision was correct." No written policy of the Commission expressly forbade returning the medical report to the medical panel. And, given the role of the medical panel as an ALJ's

adjunct, the district court found that the statute implicitly permits the ALJ to seek further assistance prior to deeming the report final. The district court also concluded that LaJeunesse's only purpose in permitting the return of the medical reports was to correct errors of law or phrasing contained in the reports and to train the physicians who had prepared them.

¶14 The district court went on to assess the question whether *ex parte* contacts between the ALJ and the medical panel required notice to the parties. It found the Utah Code of Judicial Conduct to be instructive. Rule 2.9 of that code prohibits most *ex parte* communications. One exception to the rule allows:

> [a] judge [to] consult with court staff and court officials whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities, or with other judges, provided the judge makes reasonable efforts to avoid receiving factual information that is not part of the record and does not abrogate the responsibility to personally decide the matter.

UTAH CODE OF JUD. CONDUCT r. 2.9(A)(3). Because the medical panel is recruited, appointed, and paid by the labor commission to advise the ALJ, the district court found medical panels to be akin to a "court official[] whose functions are to aid the judge in carrying out the judge's adjudicative responsibilities" under rule 2.9 of the Utah Code of Judicial Conduct. The district court also cited the less formal nature of the administrative process in determining that ALJs can have *ex parte* contact with persons specifically employed to provide them expertise. For these reasons the district court concluded that there was no existing statute or policy requiring parties to be informed of contacts between the ALJ and the medical panel.

¶15 The district court also concluded that LaJeunesse's "failure to disclose [the communications between him and the medical panels] in . . . specific cases does not rise to the level of conduct prejudicial to the administration of justice." In the district court's view, "the specific changes in the cases known of by [LaJeunesse] were not substantive and the parties were not deprived of a meaningful opportunity to contest them—indeed, there was no evidence that any of the requested changes to the panel reports were inappropriate or altered the panel's medical conclusions." In any event, the district court held that "reasonable minds can differ as to whether such communications involving technical corrections to the medical report are necessarily improper, or must be disclosed to the parties."

¶16   The "OPC argue[d] that [LaJeunesse's] authorization and participation in the return of medical reports to medical panels without notice to the parties constituted conduct, and that it resulted in delay and increased costs." In the OPC's view, this was sufficient for an ethical violation under rule 8.4 of the Utah Rules of Professional Conduct.

¶17   The district court rejected this interpretation of rule 8.4. It noted that "[a]ttorneys and judges interpret laws all the time." "On any given day," the district court noted, "the Court is confronted by multiple cases involving competing interpretations of law"—and "at least one side is generally wrong." "Attorneys and judges take actions or advise others to take actions based on those interpretations." And "often, such an interpretation (it matters not whether it is right or wrong, under the OPC's argument here requiring only conduct) causes delay or increased expense."

¶18   The district court relied on *In re Worthen*, 926 P.2d 853 (Utah 1996)—an opinion of this court interpreting similar language in the Utah Constitution concerning judicial discipline. *In re Worthen* rejects the proposition that judges may be subject to the disciplinary process for committing a legal error. *Id.* at 869. It states the following:

> The offenses that subject a judge to discipline should be defined in such a way as to minimize the potential for overlap between the judicial conduct machinery and the appeal process. For it is worth emphasis that a judge has not behaved improperly simply because he has committed an error. As we noted earlier, the entire appellate process is in place because it is expected that judges will err occasionally, at least in the eyes of the appellate courts. This does not mean that they are not functioning properly as judges, only that they are human beings functioning within a human institution where different people can see things differently. The [disciplinary] process cannot legitimately have as a purpose the punishment of those who commit legal error; rather, it must concern itself only with those who behave outside the ethical norms set for judges, and the constitution and implementing statutes and rules must be so construed.

*Id.* at 868–69. The district court determined that the "OPC's proposed reading of 8.4 goes too far." In focusing only on an attorney's "'conduct' and its asserted effect on the administration of justice,"

the court noted that the "OPC fails to account for legal error, which itself is part of the administration of justice." "Ordinary error or differences of opinion," in the court's view, "are not prejudicial to the administration of justice." "[T]hey are something we expect on the way to truth."

¶19 The district court went on to find that the phrase "conduct prejudicial to the administration of justice" implies some breach of ethical canons. In support of that conclusion, the district court cited the comments to rule 8.4. It noted that comment 2 limits those offenses that "a lawyer should be professionally answerable for," including "violence, dishonesty, breach of trust or serious interference with the administration of justice." UTAH RULES OF PROF'L CONDUCT r. 8.4 cmt. 2. The district court also again relied on this court's analysis in *In re Worthen*, in which we explained the following:

> [T]he first clause employs the term "conduct" rather than the term "misconduct" as used in the first ground for judicial discipline, which could, on its face, suggest that the act or acts covered by this ground could be other than a breach of the ethical norms governing judges. However, *concerns about limiting the Commission's jurisdiction to matters of misconduct, not legal error, as well as concerns about vagueness and adequate notice,* lead us to conclude that the term should carry the same definition we gave to "misconduct," i.e., both grounds require "unjudicial conduct," which we have defined as a breach of the ethical canons contained in the Code of Judicial Conduct.

926 P.2d at 870 (emphasis added).

¶20 The district court also continued the analogy to the Utah Code of Judicial Conduct:

> [Al]though Rule 8.4 is entitled "Misconduct" and uses that term in other parts of the Rule, Section 8.4(d) refers to just "conduct." As in *Worthen*, this on its face supports [the] OPC's argument here. But for the same reasons articulated in *Worthen*, the Court concludes that Rule 8.4(d) cannot be read to put stricter limits on advocacy than those imposed by existing norms. Certainly, an objectively reasonable position taken in good faith by an ALJ in fulfillment of his or her duties cannot support a claim that the conduct taken as a

result in a violation of Rule 8.4(d). The line to be drawn here needs to permit and even encourage acceptable legal advocacy including, in this case, administration of an agency's quasi-judicial process. For that reason, the line to be drawn defining where a Rule 8.4(d) [violation] begins should provide some daylight between reasonable interpretations of law on the one hand and ethical violations on the other.

¶21   Finally, the district court found that LaJeunesse had not violated rule 8.4(d):

As found above, none of [LaJeunesse's] actions involved any morally questionable motive. This is not a repeated pattern of independent violations but a single change in interpretation affecting five cases. The Court has concluded that the actions were either legally permitted or at least did not violate express statute or policy. More importantly, whether or not the actions were legally correct or even advisable, they were taken pursuant to objectively reasonable legal interpretations. No violation of Rule 8.4(d) has been shown.

¶22   The district court dismissed the petition against LaJeunesse on the above grounds. The OPC then filed this appeal.

¶23   Our review in attorney discipline matters is *sui generis*. We afford some deference to the district court's findings. *See In re Discipline of Barrett*, 2017 UT 10, ¶ 11, 391 P.3d 1031. But we reserve a degree of discretion to override the district court's findings where we find them unsupported in the record and also to draw our own inferences from those facts that may differ from the inferences drawn by the district court. *Id*. We have rooted this standard in the fact that this court bears the responsibility for attorney discipline under the Utah Constitution. *In re Discipline of Ince*, 957 P.2d 1233, 1236 (Utah 1998) (citing UTAH CONST. art. VIII, § 4).

II

¶24   The OPC's opening brief on appeal begins with a detailed statement of facts. And it proceeds to an argument that LaJeunesse's conduct was prejudicial to the administration of justice. The OPC's argument proceeds essentially in four steps: (1) the policy adopted by LaJeunesse runs counter to the language and structure of the Workers' Compensation Act, Utah Code section 34A-2-601(2); (2) application of that policy interfered with the administration of justice by depriving parties and their counsel of the opportunity to review

and respond to proposed changes to a medical panel's report; (3) attorneys in other jurisdictions have been found to have engaged in conduct prejudicial to the administration of justice when they gave false or misleading testimony or destroyed documents with evidentiary value[1]; and (4) the district court's dismissal of the charge against LaJeunesse was based only on LaJeunesse's self-serving testimony that the policy in question was based on a good faith interpretation of the statute, and LaJeunesse's state of mind should only have been a factor in deciding on an appropriate sanction—not in deciding whether he violated the Utah Rules of Professional Conduct in the first place.

¶25   LaJeunesse challenges the OPC's brief as insufficient. He asks us to strike the brief for its failure to follow several of the dictates of rule 24 of the Utah Rules of Appellate Procedure. He notes, specifically, that the brief fails to append the district court's decision to its brief, *see* UTAH R. APP. P. 24(a)(12)(B) (mandating that the addendum include the "order, judgment, opinion, or decision under review"); fails to cite the record to show where its arguments were preserved below, *see id.* 24(a)(5)(B) (requiring "citation to the record showing that [an] issue was preserved for review"); and fails to identify specific findings or conclusions of the district court that the OPC is challenging on appeal or to marshal evidence or legal authority in support of arguments for reversal of such findings or conclusions, *see id.* 24(a)(8) (requiring appellant to "explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal"). In sum, in LaJeunesse's view, the "OPC barely acknowledges the [district] court's ruling in its brief, arguing as if this Court were in *de novo* proceedings." And for that reason LaJeunesse says that we "need not reach the merits of [the] OPC's argument," but may simply affirm after striking or disregarding the OPC's brief.

¶26   These points are well taken. The OPC has failed to carry its burden as the appellant in a number of respects, and we may affirm on that basis. That said, we feel compelled to offer some points of our own analysis of the questions presented. We do so because the OPC has not utterly failed to address the district court's decision—it

---

[1] *See Attorney Grievance Comm'n v. White*, 731 A.2d 447, 457 (Md. 1999); *Disciplinary Counsel v. Robinson*, 933 N.E.2d 1095, 1097 (Ohio 2010).

identifies some elements of the decision it is challenging on appeal—and because the responsibility to oversee the attorney discipline process is ours under the Utah Constitution. *See* UTAH CONST. art. VIII, § 4. With this in mind, we offer our own endorsement of the central basis for Judge Stone's careful decision while noting a minor caveat.

A

¶27    As the appellant it is the OPC's burden to identify the grounds for the district court's decision that it is challenging on appeal. The OPC must also persuade us, "with reasoned analysis supported by citations to legal authority and the record, why" it "should prevail on appeal." UTAH R. APP. P. 24(a)(8). That burden stands despite our recent decisions limiting or at least clarifying the extent of the "marshaling" duty set forth in our case law. *See, e.g.*, *State v. Nielsen*, 2014 UT 10, ¶ 41, 326 P.3d 645.

¶28    *Nielsen* repudiates the "procedural default" notion of a requirement of marshaling. *Id.* ¶¶ 37, 41. But it also reinforces the longstanding notion that a party challenging a lower court decision "will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal" and respond to evidence or authority that could sustain the decision under review. *Id.* ¶ 42. And the OPC has failed to do just that.

¶29    The problem with the OPC's brief begins with its failure to append or recite the findings and conclusions entered by the district court. This case was decided on an extensive record after a five-day bench trial. Yet the OPC's statement of the factual and procedural background of the case makes only the barest mention of the district court's analysis. The OPC notes that the court entered findings and conclusions on March 16, 2016. But the bare mention of that fact is all that is provided. The OPC brief nowhere recites any of the extensive findings or conclusions that we set forth above. *See supra* ¶¶ 8–22.

¶30    This problem is also reflected in the argument section of the OPC's brief. There the OPC makes no mention of most of the crucial elements of Judge Stone's ruling. As noted above, the OPC's argument is mostly about the legal propriety and practical effect of LaJeunesse's policy for ALJs' treatment of medical panel reports—the assertion that this policy does not conform to the requirements of the Workers' Compensation Act and the argument that it prejudices the administration of justice by depriving parties and their counsel with the opportunity to respond to proposed changes to a medical panel report.

¶31   These tenets of the OPC's position ignore crucial elements of Judge Stone's analysis. Nowhere does the OPC address Judge Stone's assertion that a determination of *an ALJ's* "conduct prejudicial to the administration of justice" must leave room for a judge to make a good faith mistake that might be reversed on appeal, or his conclusion that LaJeunesse did not violate rule 8.4(d) because his policy for treating medical panel reports was "an objectively reasonable position taken in good faith by an ALJ in fulfillment of his . . . duties." Tellingly, the OPC fails even to cite our opinion in *In re Worthen*, 926 P.2d 853 (Utah 1996)—a decision that is a central basis for Judge Stone's decision. Thus, the OPC offers no basis for reversal of the district court's decision.

¶32   This alone is a basis for affirmance. The appellant bears the burden of identifying grounds for reversal of the decision of the court (or administrative agency) being reviewed on appeal. *See Utah Physicians for a Healthy Env't v. Exec. Dir. of the Utah Dep't of Envtl. Quality*, 2016 UT 49, ¶ 20, 391 P.3d 148 (affirming on the basis of appellant's failure to identify and challenge portions of the decision being reviewed on appeal). If the appellant fails to acknowledge the lower court's decision—or to identify specific grounds for challenging it—we may affirm without reaching the merits of the question presented. *See id.*

¶33   We could affirm Judge Stone's decision on this basis. Several of the central tenets of Judge Stone's findings and conclusions, as noted, are nowhere addressed in the OPC's brief. And we could therefore allow the district court's decision to stand without reaching the merits.

B

¶34   We also agree with the bulk of Judge Stone's analysis—with one caveat. We begin with the caveat and then outline our extensive points of agreement.

¶35   Judge Stone appears to endorse (at least in part) the statutory basis advanced by LaJeunesse in support of the medical panel policy that he adopted. The apparent endorsement is reflected in related aspects of Judge Stone's findings: (1) his rejection of the OPC's view that "clarification requests" by an ALJ to a medical panel report are permitted under the Workers' Compensation Act "only after an original report is mailed to the parties"—a view that in Judge Stone's opinion "has no more support in the statutory language than the reading advanced by LaJeunesse allowing a report to be returned to the medical panel before distribution to the

parties"; (2) his conclusion that the Workers' Compensation Act "implicitly permits the ALJ to seek further assistance" before treating a report received from a medical panel as final and "mailing it to the interested parties"; and (3) his conclusion that "no existing statute or policy . . . prohibited communications between a medical panel and ALJs concerning a case under review" or "required the parties to be informed of such contacts."

¶36 The OPC devotes substantial attention to these conclusions in its brief. In arguments echoed by an amicus, Workers Compensation Fund, the OPC seeks to establish that the district court's view of an ALJ's discretion in the treatment of a medical panel report is undermined by the terms of the Workers' Compensation Act.

¶37 We take no position on this question. Thus, the caveat in our decision affirming Judge Stone's careful findings and conclusions is simply to note that we need not and thus do not offer our own independent analysis of the question whether the policy adopted by LaJeunesse is consistent with the terms and conditions of the Workers' Compensation Act.

¶38 We leave that question unanswered because we find it unnecessary to the disposition of this attorney discipline case. And we find it unnecessary because we agree with the central tenets of Judge Stone's analysis of the operative standard under rule 8.4(d) of the Utah Rules of Professional Conduct.

¶39 The threshold question is the standard of "conduct prejudicial to the administration of justice" as applied to the lawyer's role of advising or opining on unresolved questions of law. Lawyers are often called upon to chime in on such questions. As Judge Stone noted, "[a]ttorneys and judges [often] take actions or advise others to take actions based on" the view they take on disputed questions of law. A trial judge, for example, may face "multiple cases" each day "involving competing interpretations of law." "[A]t least one side is generally wrong." And our legal system could not function if the side whose view is rejected is in jeopardy of a professional misconduct charge on that basis alone.

¶40 As Judge Stone noted, our decision in *In re Worthen* is instructive. There we considered the question whether a trial judge is susceptible to discipline for "conduct prejudicial to the administration of justice" where he makes a legal error subject to reversal on appeal. *In re Worthen*, 926 P.2d at 874. We answered that question in the negative. *See id.* (concluding that "mere errors of

law . . . should ordinarily be dealt with through the appeals process"). We noted that the operative disciplinary standard speaks in terms of "'conduct' rather than . . . 'misconduct'"—a term that appears elsewhere in the code (as with regard to criminal acts). *Id.* at 870. And we acknowledged that the bare reference to *conduct* "could, on its face, suggest that the act or acts covered by this ground could be other than a breach of the ethical norms governing judges." *Id.* Yet we rejected that interpretation. We held instead that "conduct prejudicial to the administration of justice" as applied to a judge requires proof of "'unjudicial conduct,' which we defined as a breach of the ethical canons contained in the Code of Judicial Conduct." *Id.* And we therefore concluded that a judge cannot be charged with conduct prejudicial to the administration of justice merely for committing "legal error." *Id.* Instead, we held that this standard as applied to judges "must concern itself only with those who behave outside the ethical norms set for judges." *Id.* at 869.

¶41 Judge Stone also turned to the comments to rule 8.4. Those comments, as he indicated, explain that not even all forms of *criminal* misconduct reflect adversely on the fitness to practice law. "Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that that indicate lack of those characteristics relevant to law practice." UTAH RULES OF PROF'L CONDUCT r. 8.4 cmt. 2. The dividing line, traditionally, has been "drawn in terms of offenses involving 'moral turpitude.'" *Id.* Thus, "[o]ffenses involving violence, dishonesty, breach of trust or serious interference with the administration of justice" are chargeable under rule 8.4. *Id.* But other offenses may subject a lawyer only to personal (as opposed to professional) accountability.

¶42 Judge Stone took the above into account in establishing the standard of "conduct prejudicial to the administration of justice" that applies in this case. "[F]or the same reasons articulated in *Worthen*," Judge Stone "conclude[d] that Rule 8.4(d) cannot be read to put stricter limits on advocacy than those imposed by existing norms." Thus, he held that "an objectively reasonable position taken in good faith by an ALJ in fulfillment of his or her duties cannot support a claim that the conduct taken as a result is in violation of Rule 8.4(d)." "The line to be drawn . . . needs to permit and even encourage acceptable legal advocacy including, in this case, administration of an agency's quasi-judicial process."

¶43 We agree with these premises of Judge Stone's decision and affirm on this basis. Lawyers and judges are often called upon to

opine on open questions of law. When they do so in good faith they cannot be charged with a violation of rule 8.4(d) just because their interpretation is ultimately rejected as a matter of law. And we agree with Judge Stone that the policy adopted by LaJeunesse was adopted in good faith.

¶44   We may ultimately agree with the OPC that the better view of the Workers' Compensation Act is one that would call for an open and transparent use of medical panel reports by ALJs. But the Workers' Compensation Act nowhere expressly forecloses the approach endorsed by LaJeunesse. And we see no reason to conclude that LaJeunesse made anything other than a good faith mistake in interpreting the law. That conclusion is sufficient to sustain the dismissal of the charge against him.

¶45   The OPC has not meaningfully refuted these premises. Much of its briefing is aimed at challenging the statutory basis for LaJeunesse's policy—at establishing that the better view of the Workers' Compensation Act is one that would require a transparent, open use of medical panel reports and foreclose the review process endorsed by LaJeunesse. This argument is insufficient for reasons set forth above.

¶46   The cases cited by the OPC— *Attorney Grievance Commission v. White*, 731 A.2d 447, 457 (Md. 1999) and *Disciplinary Counsel v. Robinson*, 933 N.E.2d 1095, 1097 (Ohio 2010)—are distinguishable. We endorse the view set forth in these cases. We agree that an attorney who tampers with evidence or gives false or misleading testimony has engaged in conduct prejudicial to the administration of justice. But these cases do not undermine the standard we establish here. They simply hold that rule 8.4(d) is violated by an attorney's acts in contravention of established rules and norms governing the judicial process. *See White*, 731 A.2d at 457 (holding that presenting perjured testimony is a violation of rule 8.4 and noting that perjury is a crime); *Robinson*, 933 N.E.2d at 1097 (holding that tampering with evidence is a violation of rule 8.4 and noting that evidence tampering is a crime and violates other established rules).

¶47   An attorney who tampers with evidence or presents false testimony is not exercising good faith legal judgment. He is engaged in misconduct. That cannot be said of LaJeunesse. At most he made a good faith misjudgment of the effect of the Workers' Compensation Act on the ALJ's use of medical panel reports. And that is

insufficient to sustain a claim for conduct prejudicial to the administration of justice under rule 8.4(d).

## III

¶48 We can understand the OPC's motivation in pursuing this case. The policy adopted by LaJeunesse seems to have interfered with the transparent operation of the system of adjudicating workers' compensation disputes. It may have deprived parties and their counsel of the opportunity to object to proposed changes to medical panel reports. And the policy in question may ultimately be incompatible with the terms and conditions of the Workers' Compensation Act—or at least with best practices thereunder. That is not enough to sustain a charge of conduct prejudicial to the administration of justice under our rules of professional conduct, however. We affirm the dismissal of the charge against LaJeunesse because we conclude that the policy in question was adopted in a good faith attempt to interpret the law.

———————————